UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GOLDMAN, SACHS & CO., et al, <br><br> Defendants. | C.A. No. 01-10729-RWZ |

**DECLARATION OF LEAD COUNSEL
IN SUPPORT OF PROPOSED SETTLEMENT AND
PETITION FOR AN AWARD OF ATTORNEYS' FEES AND
REIMBURSEMENT OF EXPENSES**

# TABLE OF CONTENTS

I.    BACKGROUND AND HISTORY OF THE LITIGATION . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    The Logic of Plaintiffs' Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Defendants' Logic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    Procedural History of the Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    Initiating the Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    Sustaining the Complaint Over Motions to Dismiss . . . . . . . . . . . . . . . 12

        3.    Defendants' Answers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        4.    Class Certification and the Impact of the Bankruptcy Proceedings . . . . 16

        5.    Substitution of Lead Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        6.    Class Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        7.    Fact Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        8.    The Underwriter Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        9.    Continued Litigation Against the Individual Defendants . . . . . . . . . . . . 26

            a.    Fact Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            b.    Expert Reports and Expert Discovery . . . . . . . . . . . . . . . . . . . . 27

                i.    Plaintiffs' Expert Stephen D. Prowse . . . . . . . . . . . . . . 27

                ii.    Defendants' Damages Expert Christopher M. James . . . 29

                iii.    The Expert Rebuttal Reports on Damages . . . . . . . . . . . 30

                iv.    Defendants' Liability Expert Brian J. Lane . . . . . . . . . . 33

            c.    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

                i.    Plaintiffs' Summary Judgment Motions . . . . . . . . . . . . 33

i

          ii.     Defendants' Summary Judgment Motions . . . . . . . . . . . 34

    d.    Lead Plaintiffs' Pre-Trial Motions . . . . . . . . . . . . . . . . . . . . . . . 36

          i.     ... To Preclude the Expert Report and Testimony
                 of Defendants' Expert Brian J. Lane . . . . . . . . . . . . . . . 36

          ii.     ... To Preclude Defendants' Assertion of a Due
                 Diligence Defense at Trial Based on "Reliance
                 on Counsel" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

          iii.    ... To Preclude Defendants' "Incorporation By Reference"
                 and "Failure to Exercise Due Care" Defenses . . . . . . . 37

          iv.    ... To Preclude the Expert Report and Testimony
                 of Defendants' Damages Expert Christopher M. James . 38

    e.    Trial Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

  10.    The Individual Defendants Settlement . . . . . . . . . . . . . . . . . . . . . . . . . 40

II.    THE TERMS OF THE SETTLEMENT AND THE PLAN OF ALLOCATION . . . . . . 41

  A.    The Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

  B    The Plan of Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

III.    EVALUATION OF THE SETTLEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

  A.    Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

  B.    The Settlement's Procedural Fairness Confers a Strong Presumption
       of Substantive Fairness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

  C.    Factors to Be Considered in Support of Settlement . . . . . . . . . . . . . . . . . . . . . 48

    1.    Complexity, Expense and Likely Duration of the Litigation . . . . . . . . . . 49

    2.    Reaction of the Class to the Settlement . . . . . . . . . . . . . . . . . . . . . . . . . 52

    3.    Stage of the Proceedings and the Amount of Discovery Completed . . . . 53

        4.     Risks of Establishing Liability and Damages . . . . . . . . . . . . . . . . . . . . . 55

                a.     General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

                b.     Specific Liability Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

                c.     Specific Damages Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        5.     Risk of Maintaining the Class Action Through Trial . . . . . . . . . . . . . . 63

        6.     Ability of the Defendants to Withstand a Greater Judgment . . . . . . . . . 64

        7.     Range of Reasonableness of the Settlement Fund in Light of the
             Best Possible Recovery and in Light of All the Attendant Risks
             of the Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

IV.    THE PLAN OF ALLOCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

V.     EVALUATION OF THE FEE REQUEST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    A.    Basic Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    B.    Basic Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    C.    The "Core" Factors Used by Courts in Assessing and Awarding Fees . . . . . . . . 73

        1.     The Result Obtained: The Size of the Fund Created
             and the Number of Persons Benefitted . . . . . . . . . . . . . . . . . . . . . . . . . 73

        2.     Class Response: The Presence or Absence of Substantial Objections . . 74

        3.     The Attorneys' Skill, Efficiency and Quality of Representation . . . . . . . 75

        4.     The Risks, Complexity and Difficulty of the Litigation . . . . . . . . . . . . 78

        5.     Contingency and the Risk of Non-Payment . . . . . . . . . . . . . . . . . . . . . 81

        6.     The Amount of Time Devoted to the Case by Plaintiffs' Counsel . . . . . 84

        7.     Fee Awards in Similar Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

    D.    Further Factors Considered by Some Courts in Awarding Attorneys' Fees . . . . 90

E.  The Lodestar Cross-Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

F.  Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

STATE OF NEW YORK      )
                                   )  ss.:
COUNTY OF NEW YORK   )

MARK A. STRAUSS, being duly sworn, says:

1.      I am a member of the law firm of Kirby McInerney & Squire, LLP ("KMS"), which was retained by Lead Plaintiffs – John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, Investors Partner Life Insurance Company, and John Hancock Life Assurance Company (collectively, "Hancock") – in September 2004 to serve as lead counsel for Lead Plaintiffs and the plaintiff class (the "Class") in this action (hereinafter, the "Litigation"). I was actively involved in the prosecution of this Litigation from the time that KMS was retained, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the Litigation.

2.      Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and Rule 408 of the Federal Rules of Evidence, I respectfully submit this declaration, together with the accompanying memorandums of law, in support of plaintiffs' applications for approval of:

(a)     the settlement of the Litigation, consisting of a recovery for the Class of $19.25 million in cash, as set forth in the stipulation of settlement executed on September 19, 2006 between Lead Plaintiffs and the Underwriter Defendants[1] (the "Underwriter Stipulation"), the

---

[1]     Namely, the investment banks that underwrote the specific bond issues (the "Owens Corning Debt Securities") purchased by the Class:  Banc of America Securities LLC (formerly known as NationsBanc Montgomery Securities LLC, for itself and as successor to BancAmerica Robertson Stephens), Barclays Capital Inc., BNY Capital Markets, Inc., Citicorp North America Inc. (as successor by merger to Citicorp Securities Inc.), Credit Suisse Securities (USA) LLC, as successor to Credit Suisse First Boston Corporation, Goldman, Sachs & Co., J.P. Morgan Securities Inc., formerly known as Chase Securities Inc., for itself and as successor to J.P. Morgan Securities

(continued...)

1

stipulation of settlement executed on March 28, 2007 between Lead Plaintiffs and the Individual

Defendants[2] (the "Individual Defendants Stipulation"), and the supplemental stipulation of

settlement between Lead Plaintiffs, the Underwriter Defendants and the Individual Defendants

executed on March 28, 2007 (the "Supplemental Stipulation") (collectively, the "Stipulations");

      (b)    the proposed plan of allocation (the "Plan of Allocation") as set forth in the

Stipulations, and

      (c)    the application of plaintiffs' counsel for an award of attorneys' fees and

reimbursement of expenses (the "Fee Request").

      3.    I respectfully submit that the Court should approve the Settlement.

      4.    As detailed below, the Settlement offers a very substantial recovery to the

Class. Plaintiffs' damages expert calculated maximum possible Class-wide damages to be

approximately $105 million. Realistically provable damages, however, were certainly and

substantially less, given that the price of the securities at issue (the "Debt Securities") significantly

recovered during the Litigation and even traded at prices *above* their issue prices. Class members

who sold some or all of their Debt Securities at such favorable levels would have their Section 11

---

[1](...continued)
Inc. (formerly doing business as J.P. Morgan & Co.) and First Chicago Capital Markets, Inc., Merrill
Lynch, Pierce, Fenner & Smith Incorporated, RBC Capital Markets Corporation (formerly known
as RBC Dominion Securities Corporation), Scotia Capital (USA) Inc. (formerly known as Scotia
Capital Markets (USA) Inc.), and Cowen and Company, LLC (sued as SG Cowen Securities
Corporation).

[2]    Namely, the directors of Owens Corning, Inc. who signed the registration statements
for the Owens Corning Debt Securities: Norman P. Blake, Jr., Gaston Capterton, Domenico Cecere,
Leonard S. Coleman, Jr., William W. Colville, John H. Dasburg, Landon Hilliard, Glen H. Hiner,
Sir Trevor Holdsworth, Jon M. Huntsman, Jr., Ann Iverson, W. Walker Lewis, Michael I. Miller,
Furman C. Moseley, Jr., W. Ann Reynolds, and Steven J. Strobel.

damages reduced or even eliminated. However, there was no way of ascertaining precisely how this would effect aggregate damages without details of each Class member's investment particulars, which was impossible to obtain without a claims process.

5.      Meanwhile, the damages expert retained by Defendants opined that damages were most likely $0 and at most $1.5 million.

6.      The Settlement achieved here is not only well within the range of reason, but is a demonstrably superior recovery of Class-wide losses. The Class' $19.25 million recovery here, approximately 18.2% of plaintiffs' maximum possible damages estimate, is several multiples of the class action norm.[3]  Given average claim rates, Class members who file claims likely will recover an even greater percentage of their losses.

7.      As detailed below, the Class' reaction confirms the objective fairness of this Settlement.  As concrete an indicator as possible of Class members' views of this Settlement is the complete absence of any objection to the Settlement.  Likewise, there is no objection to the Plan of

---

[3]      *See* Ronald I. Miller, Todd Foster & Elaine Buckberg, *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, Is Stabilization Ahead?* (NERA Economic Consulting, April 2006) at pp. 7-8 (finding a median recovery of 2.5%-3% of investors' losses in recent securities class action settlements); *accord*, Laura E. Simmons and Ellen M. Ryan, *Post-Reform Act Securities Settlements: 2005 Review and Analysis* (Cornerstone Research, 2006) at p. 5 (average settlement recovered 3% of aggregate damages). *See also*, *In re Rite Aid Corp. Securities Litigation,* 146 F.Supp.2d 706, 715 (E.D. Pa. 2001) ("recent study shows that settlements since 1995 of securities class actions have recovered between 5.5% and 6.2% of the class members' estimated losses");*In re Merrill Lynch & Co. Inc. Research Reports Securities Litigation*, 2007 WL 313474, at * (S.D.N.Y. Feb. 1, 2007) (commending counsel for recovering only 6.25% of estimated damages, a recovery the court deemed to be "at the higher end of the range of reasonableness of recovery in class actions securities litigations"); *Kurzweil v. Philip Morris Co., Inc.*, 1999 WL 1076105, at *2 (S.D.N.Y. Nov. 30, 1999) (normal range for recovery in securities class action is between 7% and 15% of the total damages); *In re Lease Oil Antitrust Litigation*, 186 F.R.D. 403, 434 n. 47 (S.D. Tex. 1999) (citing various studies showing the average recovery in securities litigation cases to be between 4% and 14% of the total loss); *In re Ashanti Goldfields*, 2005 WL 3050284, at *4 (E.D.N.Y. Nov. 15, 2005).

Allocation or the Fee Request.  The absence of objection is all the more noteworthy given that this Class is believed to be composed primarily of large, sophisticated institutional investors – i.e., those with the most ability and inclination to object when warranted.  Similarly, not a single Class member has "voted with their feet" by requesting exclusion from the Class and this Settlement.

8.     As detailed below, Lead Plaintiffs achieved such recovery despite substantial contested issues with respect to both liability and damages. These included, at the time of Settlement, multiple summary judgment motions brought by the Individual Defendants on liability and damages grounds.  Notwithstanding the fact that plaintiffs' cause faced real risks and challenges, Lead Plaintiffs believed that their claims possessed substantial merit:  also pending at time of Settlement were Lead Plaintiffs' own motions for partial summary judgment, as well as multiple pre-trial and *in limine* motions seeking to strengthen plaintiffs' position at upcoming trial.

9.     As detailed below, the Settlement was achieved as trial approached, after more than four years of hard-fought litigation that served to clarify to all parties the strengths and weaknesses of the case.   The Settlements resulted from multiple mediation sessions with experienced mediators and involved negotiation by knowledgeable and experienced counsel for all parties.  The record amply demonstrates – as evidenced in part by the length of time required for all parties to agree upon the Stipulations – that settlement negotiations were vigorous and arm's-length (and, at times, very contentious).  Numerous times the negotiations nearly collapsed as various parties expressed the preference to return to trial rather than agree to settle on the terms then being advanced by opposing parties.

10.     I also respectfully submit that the Court should approve Lead Plaintiffs' proposed Plan of Allocation.  The Plan of Allocation was set forth fully in the Notice of Pendency

and Settlement of Class Action (the "Notice") that was mailed to members of the Class. As detailed below, the Plan of Allocation is equitable and just. The Plan of Allocation is simple, commonsensical and easily understood, and was designed to straightforwardly reflect Class members' likely damages so that Class members with greater damages would receive correspondingly greater allocations from the Settlement.

11. Finally, I also respectfully submit that the Court should award the requested fees and expenses.

12. As detailed in the accompanying memorandum of law in support of Lead Counsel's fee application, this Court should, pursuant to prevailing standards under the PSLRA, accord a "presumption of reasonableness" to Lead Counsel's Fee Request. This is because the Fee Award sought – 25% of the aggregate amount recovered, plus expenses – is requested pursuant to a retainer agreement negotiated by experienced and sophisticated institutional investors (i.e., Hancock) who were duly appointed here as lead plaintiffs, and thereby statutorily authorized to retain and enter into a fee arrangement with class counsel.[4]

13. As explained below, Lead Plaintiffs commenced this action using the law firm

---

[4]       *See, e.g., In re Cendant Corp. Litigation*, 264 F.3d 201, 254-256 (3rd Cir. 2001) ("under the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel. This presumption will ensure that the *lead plaintiff, not the court, functions as the class's primary agent vis-a-vis its lawyers*. Further, by rendering ex ante fee agreements more reliable, it will assist those agreements in aligning the interests of the class and its lawyers during the pendency of the litigation."); Elliot Weiss & John Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2105 (1995) ("[A] court might well feel confident in assuming that a fee arrangement an institutional investor had negotiated with its lawyers before initiating a class action maximized those lawyers' incentives to represent diligently the class's interests, reflected the deal a fully informed client would negotiate, and thus presumptively was reasonable.").

of Dwyer & Collora, LLP ("D&C") as Lead Counsel.  D&C litigated this action through the class-certification stage on an ordinary hourly, non-contingency-fee basis.  Lead Plaintiffs paid D&C approximately $500,000 in fees and expenses out-of-pocket for its services.  On September 16, 2004, Lead Plaintiffs formally retained present Lead Counsel, Kirby McInerney & Squire, LLP, to replace D&C as Lead Counsel.  D&C continued to assist the litigation as Liaison Counsel, on an hourly, non-contingency-fee basis.

14.     Hancock's retention of KMS was memorialized in a written retention agreement (the "KMS Retainer Agreement") executed after several weeks of negotiation between Hancock's in-house legal department and KMS.[5]

15.     Hancock's agreement is in itself strong evidence of the reasonableness of the fee requested, but under the circumstances it should be considered even more significant.  While most class action retention agreements are negotiated pre-litigation and at a point when the client has a mere speculative possibility of being appointed lead plaintiff, by the time the retention agreement was negotiated here, Hancock not only had been appointed lead plaintiff but had also been appointed class representative.  Thus, at the time of the KMS Retainer Agreement, Hancock was found adequate and was functioning as a duly appointed fiduciary to the Class.  Furthermore, having already litigated the motions to dismiss and for class certification, Hancock – which is not only a large and sophisticated institutional investor with substantial fiduciary experience but also (as an insurer) essentially in the business of evaluating litigation risk – was fully aware of the risks

---

[5]     Because the KMS Retainer Agreement contains confidential attorney work-product (evaluation and analysis of the Litigation) and is an attorney-client communication, we have not included it as an exhibit hereto.  However, the KMS Retainer Agreement is available for the Court's *in camera* inspection.

associated with the Litigation, including the strengths and weaknesses of the claims, the salient
defenses being asserted by the Defendants and the likely course of the Owens Corning bankruptcy.
Thus, unlike in most cases (in which the lead plaintiff retains lead counsel prior to any substantive
litigation), Hancock here, at the time it retained KMS, possessed a thorough understanding of the
Litigation.

16.     Pursuant to the KMS Retainer Agreement, KMS litigated this action on a
contingency fee basis, while Lead Plaintiffs agreed to support an application by KMS for an award
of fees of up to 25% of the aggregate of any amount recovered, plus expenses.  KMS, however, is
not entitled to keep the entire award.  Under the KMS Retainer Agreement, KMS is obligated to
reimburse Hancock for the attorneys' fees and expenses that Hancock has paid out-of-pocket to
D&C, plus any unpaid attorneys' fees or expenses incurred by D&C and owed by Hancock, out of
any attorneys' fees and expenses awarded to KMS by the Court.  (KMS also agreed to pay Hancock
interest with respect to Hancock's out-of-pocket payments to D&C).

17.     Nothing here rebuts the presumption of reasonableness to which the Fee
Request is entitled. Furthermore, independent analysis only confirms the reasonableness of the
requested fees here.  Indeed, the Fee Request falls well within the range recognized as fair,
reasonable and appropriate in federal securities class actions such as this, and in fact is slightly
below the average fee awarded by courts in comparable class action litigation.  A lodestar cross-
check yields the same conclusion: the lodestar multiplier here (1.86) is well below historical norms
for class actions as a whole (3.89 multiplier) and for class actions of similar magnitude (1.97
multiplier).  KMS has worked at Lead Plaintiffs' request on a contingent basis for years, and has
shouldered significant commitment of resources and time notwithstanding substantial uncertainty

as to whether the Litigation would be successful.  The risks here were substantially greater than class action norm, and presented counsel with a real specter of nonpayment.  The requested fee should be awarded.

## I.  BACKGROUND AND HISTORY OF THE LITIGATION

### A.  The Logic of Plaintiffs' Case

18.  The Litigation arises out of two 1998 public offerings of three debt securities (the "Debt Securities")[6] by Owens Corning, underwritten by the Underwriter Defendants and issued pursuant to registration statements signed by the Individual Defendants.  The offering documents for the Debt Securities stated that the Debt Securities were "unsubordinated" and would rank ratably and equally (or *pari passu*) with Owens Corning's other indebtedness, including debt owed by Owens Corning to its banks (the "Bank Debt").  As Owens Corning sank into bankruptcy in late 2000, the prices of the Debt Securities and the Bank Debt both declined, but always traded in tandem with one another, as would be expected of instruments ranked *pari passu*.

19.  In early 2001, subsequent disclosures made it clear to the market that the Debt Securities did *not* in fact rank *pari passu* with other Owens Corning debts, but were in fact *structurally subordinated* to Owens Corning's Bank Debt.

20.  This structural subordination was caused by two factors: (1) guarantees issued by several subsidiaries, including Owens Corning Fiberglass Technology Inc. ("OCFT"), to the

---

[6]  The three issues of debt securities were:  (i) Owens Corning 7.5% Notes due May 1, 2005 (the "2005 Notes"); (ii) Owens Corning 7.7% Notes due May 1, 2008 (the "2008 Notes"); and (iii) Owens Corning 7½% Debentures due August 1, 2018 (the "2018 Debentures") (collectively, the "Debt Securities").  The 2005 Notes and the 2008 Notes were issued and sold in an April 30, 1998 Offering (the "April Offering"); the 2018 Debentures were issued and sold in a July 22, 1998 Offering (the "July Offering").

banks under the credit facility governing Owens Corning's bank loans (the "Subsidiary Guarantees"); and (2) Owens Corning's transfer of virtually all of its significant assets (intellectual property valued at approximately $800 million) to OCFT (the "OCFT Transfer").  As a result of these two factors, Owens Corning's banks possessed *de facto* superiority over holders of the purportedly equally-ranked Debt Securities in claims to Owens Corning assets.

21.     After the structural subordination became clear to the market in early 2001, the prices of the Bank Debt and the Debt Securities diverged dramatically, with the Bank Debt predictably trading much higher than the Debt Securities.  In other words, whereas the Bank Debt and the Debt Securities previously had traded in tandem, a vast spread suddenly developed between the trading prices of these securities upon disclosure of the corrective information concerning the OCFT Transfer and Subsidiary Guarantees.

22.     Therefore, plaintiffs' claims in this Litigation were essentially that: (i) the registration statements for the Debt Securities were materially false and misleading because they omitted to disclose the Subsidiary Guarantees and the OCFT Transfer, and because they misrepresented the Debt Securities as unsubordinated and *pari passu* to the Bank Debt when in fact the Debt Securities were structurally subordinated to the Bank Debt; and (ii) once the structural subordination was revealed, the "spread" that developed between the value of the Debt Securities and the Bank Debt constituted the damages proximately caused by the misrepresentations and omissions concerning the status of the Debt Securities.

**B.     Defendants' Logic**

23.     As discussed below, Defendants viewed matters differently.  Defendants maintained that they had acted in good faith and reasonably believed the registration statements to

be materially complete and free of material untruth, that the existence of the Subsidiary Guarantees and their substantial value had been disclosed prior to the subject offerings, that such disclosures had been "incorporated by reference" into the registration statements, and that such disclosures were adequate to alert investors to the structural subordination.  Additionally, Defendants argued, given the disclosures contained in the 1998 registration statements and the company's prior SEC filings, plaintiffs' claims – initiated only in 2001 – were untimely and barred by the statute of limitations.  Defendants claimed, therefore, that they could not be held liable for investors' damages.

24.     Moreover, Defendants argued, Debt Securities investors had no damages to assert.  As a preliminary matter, Defendants noted, the Debt Securities had subsequently recovered from their declines to trade at prices above their issue prices (so that those Class Members who continued to hold the Debt Securities and/or who sold them at such favorable prices had no damages).  More substantively, Defendants argued that even if one accepted plaintiffs' arguments that the Subsidiary Guarantees and the OCFT Transfer were concealed until early 2001, the prices of the Debt Securities did *not* decline after such purportedly "corrective" disclosures.  Defendants noted that the entirety of the Debt Securities' price declines occurred *prior* to such "corrective" disclosures, having resulted from market concerns about Owens Corning's solvency in light of the company's asbestos liabilities.   Therefore, Defendants contended, even accepting plaintiffs' allegations as true (which Defendants did not), there were no damages.

## C.     Procedural History of the Litigation

### 1.     Initiating the Litigation

25.     Lead Plaintiffs purchased in excess of $40 million of the Debt Securities in Defendants' two 1998 offerings.  As market concerns mounted over Owens Corning's solvency and

asbestos liabilities during 2000, the market prices of the Debt Securities and of the Bank Debt declined in tandem. In early 2001, documents publicly filed in connection with the Owens Corning bankruptcy proceedings – *In re Owens Corning*, Case Nos. 00-3837 to 00-3854 (Bankr. D. Del. 2000) (hereinafter, the "Bankruptcy Proceedings") – alerted the market to the existence of the OCFT Transfer and the Subsidiary Guarantees and to the resulting superiority of the Bank Debt relative to the Debt Securities. Following those disclosures, a substantial spread developed between the market prices of the Debt Securities (lower) and of the Bank Debt (higher).

26.     Lead Plaintiffs initiated the Litigation on April 27, 2001 in the United States District Court for the District of Massachusetts as a securities class action on behalf of all persons who purchased the Debt Securities. Lead Plaintiffs alleged that the registration statements for the Debt Securities misrepresented and omitted certain material information concerning the structural subordination of the Debt Securities to other indebtedness of Owens Corning and its consolidated subsidiaries.

27.     On July 5, 2001, Lead Plaintiffs filed a First Amended Complaint (the "Complaint") for violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, on behalf of all persons who purchased the Debt Securities between April 30, 1998 (the date of their first offering) and October 5, 2000 (the day prior to Owens Corning's declaration of bankruptcy) (the "Class Period"). The Complaint named as defendants the underwriters of the Debt Securities (the "Underwriter Defendants") and certain of Owens Corning's directors and officers who signed the registration statements for the Debt Securities (the "Individual Defendants") (collectively, the "Defendants"). Owens Corning itself, although the issuer of the Debt Securities, was not named as a Defendant due to its bankruptcy.

11

28.     Specifically, the Complaint alleged that the registration statements for the April Offering and the July Offering were materially false and misleading because they omitted material and required information concerning:  (i) guarantees of the Bank Debt provided by certain subsidiaries of Owens Corning (i.e., the Subsidiary Guarantees); (ii) the transfer of certain intellectual property rights from Owens Corning to one of its subsidiaries (i.e., the OCFT Transfer); and (iii) a licensing arrangement between the subsidiary and Owens Corning pursuant to which yet further assets were transferred from Owens Corning to the subsidiary.  The Complaint alleged that, as a consequence of thee three above-mentioned undisclosed facts, the Debt Securities were "structurally subordinated" to the Bank Debt and did not "rank equally" with all other unsecured debt of Owens Corning.   Therefore, the Complaint alleged that the registration statements for both the April Offering and the July Offering were untrue in having stated that the Debt Securities were "unsubordinated" and would "rank equally with all other unsecured and unsubordinated indebtedness of the Company."

29.     Additionally, the Complaint alleged that certain Defendants, in connection with the offering and sale of the Debt Securities,  made oral misrepresentations to Lead Plaintiffs and to other Class members insofar as they represented that the Debt Securities would rank "*pari passu*" – equal in right of payment – with Owens Corning's other indebtedness.

### 2.     Sustaining the Complaint Over Motions to Dismiss

30.     The Individual Defendants and the Underwriter Defendants each moved to dismiss the Complaint on November 14, 2001.

31.     Both the Individual Defendants and the Underwriter Defendants contended that plaintiffs failed to state a claim under Section 11 of the Securities Act, on the grounds that: (i)

certain information alleged to have been omitted from the registration statements – namely, the existence of the Subsidiary Guarantees – was "incorporated by reference" into the registration statements; (ii) other allegedly omitted information – namely, the OCFT Transfer – was not required to have been disclosed; (iii) the registration statements' description of the Debt Securities as unsubordinated and equal in rank to Owens Corning's other debt was truthful and not materially misleading; and (iv) given the disclosures regarding the Subsidiary Guarantees that were supposedly "incorporated by reference" into the 1998 offering documents, plaintiffs' claims, brought in 2001, were time-barred. The Individual Defendants further contended that plaintiffs' Section 15 claims failed because plaintiffs had failed to state any primary violation of Section 11. The Underwriter Defendants also contended that plaintiffs' Section 12 claims failed because plaintiffs had not alleged any oral misrepresentations and, even if any oral misrepresentations were alleged, that they were overcome by the written representations (i.e., the registration statements) which were free of untruth or error.

32.     On January 28, 2002, plaintiffs filed a combined brief in opposition to Defendants' motions to dismiss. Plaintiffs, citing numerous SEC regulations as well as case law concerning registration statement disclosures, argued *inter alia* that Defendants' "incorporation by reference" defense failed for multiple reasons, including that (a) the type of information supposedly "incorporated by reference" was not legally incorporable but was required to have been actually set forth in the registration statement, (b) the claimed "incorporation by reference" was invalid because it was not direct or specific (e.g., the registration statement incorporated by reference a document which *in turn* incorporated by reference a second document which purportedly contained the allegedly curative information) and was vague (e.g., defendants incorporated by reference numerous

lengthy documents in their entirety rather than concretely-identified portions of such documents), and (c) even if there was a valid incorporation by reference, the disclosure was materially incomplete in that it failed to disclose the OCFT Transfer, which rendered the Subsidiary Guarantees highly material.

33.     Plaintiffs additionally argued that: (i) Owens Corning was required to have disclosed the OCFT Transfer because it materially affected the rights of Debt Securities holders; (ii) Defendants' descriptions of the Debt Securities in the registration statements as "unsubordinated" and "equal in rank" were materially false and/or misleading; (iii) plaintiffs' claims were timely brought because the limitations clock started only in early 2001 when the market became aware of the Debt Securities' structural subordination; and (iv) plaintiffs' oral misrepresentations claims were not overcome by any truthful written representations because the written representations possessed similar misrepresentations.

34.     On March 29, 2002, the Individual Defendants and the Underwriter Defendants filed separate and very substantial reply briefs in support of their respective motions to dismiss.  In addition to reiterating the arguments made in their initial briefs, Defendants (especially the Underwriter Defendants) strongly disputed plaintiffs' interpretation of the SEC regulations concerning information required to be disclosed in registration statements and the manner and propriety of "incorporation by reference."  Citing a slew of SEC regulations, Defendants argued that the registration statements fully complied with all applicable disclosure regulations.

35.     On August 26, 2002, the Court issued a decision and order denying Defendants' motion to dismiss the Complaint. The Court held that, given the standards on the motion, plaintiffs had adequately presented "questions of fact . . .which render dismissal

14

inappropriate". The Court also held that plaintiffs' claims were timely brought, and that Defendants had failed to identify any "warning signs" which would have put plaintiffs on notice "at any time before Owens Corning entered into bankruptcy proceedings".

### 3.    Defendants' Answers

36.    On October 11, 2002, the Individual Defendants filed their answer to the Complaint. The answer denied the material allegations and asserted thirteen affirmative defenses, including *inter alia*, that: (i) the Complaint failed to identify any misrepresentations or omissions in the registration statements; (ii) even if facts were misrepresented and/or omitted in the registration statements, those facts were not material; (iii) the Individual Defendants acted in good faith; (iv) the Individual Defendants had reasonable grounds to believe and reasonably believed, after exercising proper due diligence and conducting a reasonable investigation, that the registration statements were true, complete and free of misrepresentations, omissions or misleading statements; (v) plaintiffs' claims were time-barred; (vi) plaintiffs failed to exercise due care in making their investments and that, had plaintiffs reasonably exercised such care, they could have learned of the alleged untruths and/or omissions of which they had complained; (vii) plaintiffs' investment losses were not caused by the alleged misrepresentations/omissions with which the Individual Defendants were charged; and (viii) any damages awarded in this Litigation would require reduction in the amount received by plaintiffs from the Bankruptcy Proceedings.

37.    On October 11, 2002, the Underwriter Defendants filed their answer to the Complaint. The Underwriter Defendants likewise denied the material allegations and asserted ten affirmative defenses, including *inter alia* that: (i) the Complaint failed to identify any misrepresentations or omissions in the registration statements; (ii) plaintiffs' claims were time-

15

barred; (iii) the Underwriter Defendants had reasonable grounds to believe and reasonably believed, after exercising proper due diligence and conducting a reasonable investigation, that the registration statements were true, complete and free of misrepresentations, omissions or misleading statements; (iv) the Underwriter Defendants acted in good faith, did not know, and even with reasonable investigation could not have discovered that the registration statement contained the complained-of misrepresentations and omissions; (v) prior to making their investments, plaintiffs could have discovered the alleged untruths and omissions of which they complained, but failed to exercise due care; (vi) plaintiffs' damages were the result of their failure to exercise due care, rather than of the Underwriter Defendants' acts; (vii) plaintiffs' investment losses were not caused by the alleged misrepresentations and omissions identified in the Complaint; and (viii) any damages awarded in this Litigation would require reduction in the amount received by plaintiffs from the Bankruptcy Proceedings.

### 4.    Class Certification and the Impact of the Bankruptcy Proceedings

38.    On February 28, 2003, Lead Plaintiffs moved for class certification and for appointment of themselves as class representatives.

39.    In connection with the class certification motion, Defendants took discovery with respect to class certification issues.  Lead Plaintiffs produced documents pursuant to Defendants' document requests, and two of the investment officers involved in Lead Plaintiffs' decision to invest in the Debt Securities were deposed by Defendants, on or about March 12, 2003 and April 28, 2003.  Plaintiffs' counsel defended these depositions.

40.    On May 6, 2003, the Underwriter Defendants (with the joinder of the Individual Defendants) filed a brief in opposition to Lead Plaintiffs' class certification motion.

16

41.     Defendants opposed class certification by claiming that Lead Plaintiffs were atypical, inadequate, lacked standing to assert certain of the Class' claims, and were subject to unique defenses.  Defendants also contended that, given purported differences between the claims of Lead Plaintiffs and other the Class members, the requisite predominance of common issues was absent.

42.     For example, Defendants argued that Lead Plaintiffs' deposition testimony showed that Lead Plaintiffs had in their possession, at the time of their investment decision, the very documents whose incorporation by reference into the registration statements made those registration statements (in Defendants' view) free of material omissions (specifically, the prior SEC filings which referred to the existence of the Subsidiary Guarantees (*see* ¶¶ 23, 31, *supra*)).  According to Defendants, as a result of having physically possessed the documents that revealed the allegedly omitted information, Lead Plaintiffs could not individually prevail on their Section 11 claims. Defendants claimed that Lead Plaintiffs were therefore subject to unique defenses, inadequate as class representatives and atypical.  Defendants also maintained that plaintiffs' deposition testimony supposedly indicated that Lead Plaintiffs did not consider the finances of Owens Corning's subsidiaries to have been material.  Furthermore, Defendants argued that, in deciding to invest in the Debt Securities, Lead Plaintiffs relied exclusively on the alleged oral representations made to them (at a roadshow presentation attended by Owens Corning's Chief Financial Officer).  Thus, Defendants contended that Lead Plaintiffs' claims were unique and not shared by Class members who had relied on the offering documents.

43.     On May 20, 2003, Lead Plaintiffs filed their reply brief in support of their motion for class certification.  Lead Plaintiffs argued, *inter alia* that: (i) Defendants misconstrued

Lead Plaintiffs' deposition testimony; (ii) the fact that Lead Plaintiffs had in their files copies of the allegedly incorporated documents was irrelevant, because those documents did not contain adequate disclosure of the OCFT Transfer, and thus, Defendants' atypicality, inadequacy and unique-defense arguments failed because Lead Plaintiffs lacked the same information as the Class; (iii) similarly, Lead Plaintiffs' purported "indifference" to subsidiary financial information was nothing "unique" to Lead Plaintiffs, but rather common to the class given that Owens Corning reported only *consolidated* financial results; and (iv) Lead Plaintiffs' oral misrepresentation claims, though unique to Lead Plaintiffs, did not "consume the merits" of the case or otherwise prevent class certification.

44.     On May 27, 2003, the Lead Plaintiffs and Defendants presented their oral arguments to the Court on the issue of class certification.

45.     At oral argument, the parties and the Court all agreed that the Court would refrain from ruling on the class certification motion pending what then seemed to be an imminent decision in the Bankruptcy Proceedings concerning the "substantive consolidation" of the bankruptcy estates of Owens Corning and of its subsidiaries. Were the Owens Corning parent and subsidiary estates to be substantively consolidated, the structural subordination of the Debt Securities complained of in this Litigation would effectively be eliminated (i.e., all bankruptcy claimants would have equal access to Owens Corning's consolidated assets, rather than the Bank Debt claimants receiving "first cut" of the assets of Owens Corning's subsidiaries, including OCFT). This would potentially have resulted in the elimination of the bulk or entirety of the Class' claims (i.e., if substantive consolidation was granted, Class members who still held their Debt Securities likely would have no legal claim and/or no damages to assert). Therefore, the issue of substantive consolidation in the Bankruptcy Proceedings was highly consequential for this Litigation, as it held

out the possibility that the Class' complaints in this Litigation would in whole or part be resolved by other means in another forum.

46.     As it later turned out, substantive consolidation was granted much later (in October 2004), only to be reversed on appeal by the Third Circuit in August 2005.  Following the Bankruptcy Court's October 2004 grant of substantive consolidation, much of the spread that had developed between the trading prices of the Debt Securities and the Bank Debt predictably narrowed. The spread gradually re-widened as the market (correctly) perceived that the Third Circuit would reverse the Bankruptcy Court's substantive consolidation decision; and after the Third Circuit's August 2005 reversal, the spread was reestablished.

47.     The parties monitored and updated the Court on the progress of the litigation of the substantive consolidation issue in the Bankruptcy Proceedings, and continued to update the Court in July, August and September 2003.  In October 2003, as an expected bankruptcy ruling had still not issued (and a motion was made instead for the presiding Bankruptcy Court Judge's recusal, which was ultimately mandated by the Third Circuit in May 2004), it became clear that the Bankruptcy Proceedings would be mired in procedural delays for the foreseeable future.  This Litigation then re-commenced.

48.     On March 9, 2004, the Court granted Lead Plaintiffs' motion for class certification with respect to the Section 11 and Section 15 claims, but denied class certification with respect to the Section 12 claims against the Underwriter Defendants (i.e., the claims resting on allegations of oral misrepresentations).

### 5.     Substitution of Lead Counsel

49.     Lead Plaintiffs commenced this action using the law firm of Dwyer &

Collora, LLP (previously defined as "D&C") as plaintiffs' Lead Counsel.  D&C litigated this action through grant of class certification.  Lead Plaintiffs paid D&C on an ordinary hourly, non-contingency-fee basis.   As detailed below, through September 2004, Lead Plaintiffs paid D&C approximately $500,000 in fees and expenses for its services.

50.   On September 16, 2004, after several weeks of negotiation, Lead Plaintiffs formally retained Kirby McInerney & Squire, LLP, to replace D&C as Lead Counsel.  In November 2004, the Court appointed KMS as Lead Counsel.

51.   Pursuant to the KMS Retainer Agreement, KMS litigated this action on a contingency fee basis, and Lead Plaintiffs agreed to support an application by KMS for an award of fees of up to 25% of the aggregate of any amount recovered, plus expenses.   D&C continued to assist the litigation as Liaison Counsel, on an hourly, non-contingency-fee basis.  Out of any fees and expenses awarded by the Court, KMS is obligated to reimburse Hancock for the attorneys' fees and expenses that Hancock has paid out-of-pocket to D&C, plus any additional unpaid attorneys' fees or expenses incurred by D&C in its capacity as Liaison Counsel.  The remainder of any fees or expenses awarded may be retained by KMS as compensation for its services.

### 6.   Class Notice

52.   Following the Court's March 9, 2004 certification of the Class, the parties worked together to agree on the form and content of a notice to be sent to Class members informing them of the pendency of the class action and affording them an opportunity to opt-out of the Litigation.  By late 2004, the parties had prepared a notice to present to the Court for approval.

53.   However, the parties held off on submitting that notice given the substantive consolidation issues then being determined in the Bankruptcy Proceedings and the pending

settlement discussions in late 2004 and early 2005 in this Litigation. The parties were concerned that the draft notice, if issued, might effectively become superseded and "outdated" because of the above-mentioned bankruptcy and settlement developments.

54. As detailed above (¶¶ 45-46, *supra*), in August 2005 the Third Circuit reversed the substantive consolidation previously ordered in the Bankruptcy Proceedings.

55. Settlement discussions in this Litigation developed, as detailed below (*see* ¶¶ 72-75, *infra*) into mediation sessions with the Underwriter Defendants in late 2005. This led to an agreement in principle for a partial settlement between the Underwriter Defendants and the Lead Plaintiffs, and ultimately to a formal September 2006 settlement between the Underwriter Defendants and Lead Plaintiffs. In connection with this partial settlement, Lead Plaintiffs and the Underwriter Defendants drafted an updated class notice, together with accompanying settlement papers, to inform class members of class certification and the partial settlement of the Litigation between Lead Plaintiffs and the Underwriter Defendants, and to afford class members the opportunity to opt-out of the Litigation.

56. Once again, however, events overtook the parties before they could finalize the class notice papers. In September 2006, settlement discussions and mediation between Lead Plaintiffs and the Individual Defendants led to an agreement in principle for a settlement between the Individual Defendants and the Lead Plaintiffs, and additional negotiations ultimately produced a Stipulation of Settlement between the Individual Defendants and Lead Plaintiffs dated March 28, 2007 (*see* ¶¶ 112-115, *infra*), thus resolving all of plaintiffs' remaining claims in the Litigation.

57. All parties subsequently collaborated to produce a new, comprehensive notice to inform Class members of the certification of the Class, the Settlement, and their rights to opt-out

or object.

58. On April 10, 2007, the Court approved the form, content and issuance of the notice prepared by the parties. Notice was mailed by May 10, 2007, and summary notice was published that same day in *The Wall Street Journal* and issued as a press release through *Business Wire*.

### 7. Fact Discovery

59. After the Court sustained Lead Plaintiffs' claims and denied the motions to dismiss on August 26, 2002, and after Defendants' answered the Complaint in October 2002, the PSLRA's stay against discovery was lifted and Lead Plaintiffs were entitled to embark on discovery. On November 14, 2002, the Court approved a proposed discovery schedule stipulated to by all parties in their Joint Statement Pursuant to Local Rule 16.1(D) filed November 12, 2002.

60. Class certification discovery and briefing (*see* ¶¶ 38-44, *supra*) consumed the first five months of 2003. In a May 27, 2003 Court hearing, the parties and the Court agreed to refrain from full-blown discovery until issuance of what then was expected to be an imminent decision on substantive consolidation from the Bankruptcy Court (¶ 45, *supra*). By October 2003, it became clear that the Bankruptcy Proceedings would be mired in procedural delays for the foreseeable future. At that point, discovery proceedings re-commenced.

61. The parties exchanged several rounds of interrogatories and document requests, and answers and objections to the same. On or about January 3, 2003, the Underwriter Defendants served their First Request for the Production of Documents on plaintiffs. On or about January 9, 2003 plaintiffs served their First Request for the Production of Documents and First Set of Interrogatories on the Underwriter Defendants and the Individual Defendants. On or about

January 17, 2003 the Individual Defendants served their First Request for the Production of Documents on plaintiffs.   On or about February 10, 2003, the Defendants served answers to plaintiffs' First Set of Interrogatories.   Also on or about February 10, 2003, plaintiffs responded to the Underwriter Defendants' First Request for Production of Documents.   On or about February 25, 2003, plaintiffs amended their Response to the Underwriter Defendants' First Request for Production of Documents.  On or about February 26, 2003, plaintiffs responded to the Individual Defendants' First Request for Production of Documents.

62.     Plaintiffs produced hundreds of pages of documents in response to Defendants' First Request for Production of Documents.

63.     On or about September 12, 2003, plaintiffs served their Second Request for the Production of Documents and Second Set of Interrogatories on the Underwriter Defendants and the Individual Defendants.   On or about December 22, 2003, the Defendants served answers to plaintiffs' Second Set of Interrogatories.   On or about April 5, 2004, the Underwriter Defendants served their Second Request for Production of Documents and First Set of Interrogatories on the plaintiffs.  On or about June 10, 2004, plaintiffs responded to the Underwriter Defendants' Second Request for Production of Documents.   On or about June 11, 2004, plaintiffs responded to the Underwriter Defendants' Second Set of Interrogatories.

64.     On or about June 23, 2004, Individual Defendant John Dasburg responded to plaintiffs' Second Set of Interrogatories.   On or about June 30, 2004, Individual Defendant Landon Hilliard responded to plaintiffs' Second Set of Interrogatories.   On or about July 14, 2004, Individual Defendant William W. Colville responded to plaintiffs' Second Set of Interrogatories. On or about September 20, 2004, Individual Defendant Norman P. Blake responded to plaintiffs'

23

Second Set of Interrogatories.  On or about September 21, 2004, Individual Defendant Sir Trevor

Holdsworth responded to plaintiffs' Second Set of Interrogatories.  On or about December 17, 2004,

Individual Defendant Furman Moseley responded to plaintiffs' Second Set of Interrogatories.  On

or about January 6, 2005, Individual Defendant Steven Strobel responded to the plaintiffs' Second

Set of Interrogatories.

65.     In response to plaintiffs' various requests for production of documents, the

Underwriter Defendants produced approximately four thousand of pages of documents (UW 00001 -

UW3804).  The Individual Defendants produced an additional four thousand pages of documents

(SUL 0001-SUL 3851).   Lead Counsel devoted substantial time and resources to reviewing and

analyzing the Defendants' productions.

66.     Thereafter, settlement discussions (as detailed below at ¶¶ 72 *et seq.*) resulted

in agreements between the parties to temporarily cease discovery activities pending the outcome of

such discussions.  Given the settlement discussions and the uncertainty raised by the appeal of the

substantive consolidation issue to the Third Circuit, the parties requested and the Court granted

extensions of discovery deadlines.

67.     In late 2005, after an agreement in principle between Lead Plaintiffs and the

Underwriter Defendants was reached, and after the Third Circuit in August 2005 reversed the

Bankruptcy Court's October 2004 order of substantive consolidation, Lead Plaintiffs re-commenced

discovery efforts in continuing the Litigation against the Individual Defendants.

68.     On or about December 7, 2005 Plaintiffs served a Notice of Subpoena and

Production of Documents on Danielle Carbone and Shearman & Sterling LLP, Owens Corning's

former outside counsel.  Shearman & Sterling LLP produced approximately eleven hundred pages

of documents in response to plaintiffs' subpoena (DC000001 - DC001096).  Lead Counsel spent additional time reviewing and analyzing these documents.

69.     Plaintiffs deposed Daniella Carbone on June 13, 2006.

70.     During May and June 2006, counsel for Lead Plaintiffs defended five depositions noticed by the Individual Defendants of certain of Lead Plaintiffs' employees and former employees, including senior investment officers and analysts for Lead Plaintiffs who had participated in Lead Plaintiffs' investments in the Debt Securities:

| Date | Name | Title |
|------|------|-------|
| May 2, 2006 | Margaret Stapleton | VP and Senior Credit Officer, Bond & Corporate Finance Department |
| May 12, 2006 | Edwin K Hines, Jr. | Senior Managing Director, Bond & Corporate Finance Department (Forest Products Team) |
| May 17, 2006 | Stephen A. MacLean | Senior Investment Officer |
| May 18, 2006 | Anthony Urick | VP and Senior Managing Director, Bond & Corporate Finance Department (Industrial Finance Team) |
| June 13, 2006 | Stacey Agretelis | Investment Analyst, Bond & Corporate Finance Department (Industrial Finance Team) |

71.     In addition to discovery taken in this Litigation, plaintiffs  reviewed and analyzed thousands of pages of exhibits and trial and deposition transcripts from the Bankruptcy Proceeding in order to prepare their case.

### 8.     The Underwriter Settlement

72.     As discussed above (*see* ¶ 66, *supra*), the parties began to explore settlement in late 2004.  In 2005, sufficient progress was made in the discussions between Lead Plaintiffs and

25

the Underwriter Defendants that both parties agreed to participate in settlement mediation to be conducted by the Honorable Layn Phillips, a former United States District Court Judge.  In September and October 2005, Lead Plaintiffs prepared a mediation brief and an expert damages analysis for submission to the mediator.  On November 2, 2005, Lead Plaintiffs and the Underwriter Defendants mediated face-to-face before Judge Phillips.

73.     Subsequently, after additional negotiations, Lead Plaintiffs and the Underwriter Defendants reached an agreement-in-principle to settle all claims between them, calling for a release of claims against the Underwriter Defendants in exchange for their payment of $8.25 million in cash.

74.     Agreement on a final settlement between the Lead Plaintiffs and the Underwriters Defendants was achieved only after many months of further negotiation, and after exchanges, modifications and rejections of many drafts of a stipulation of settlement and related documents (e.g., a proposed notice to the class of the pendency of the Litigation and of its partial settlement).

75.     On September 19, 2006, Lead Plaintiffs and the Underwriter Defendants finalized and executed a stipulation of settlement (the "Underwriter Stipulation") in which, in exchange for the release of plaintiffs' claims, the Underwriter Defendants agreed to provide a payment of $8.25 million in cash (the "Underwriter Settlement").

**9.      Continued Litigation Against the Individual Defendants**

76.     As Lead Plaintiffs were negotiating their settlement with the Underwriter Defendants between late 2005 and September 2006, Lead Plaintiffs actively advanced the Litigation with respect to the Individual Defendants.

### a.      Fact Discovery

77.      As described above (*see* ¶¶ 68-71, *supra*), during the first half of 2006, Lead Plaintiffs and the Individual Defendants exchanged interrogatories, document requests, and subpoenas (and responses and objections thereto), took and defended numerous depositions, and successfully negotiated numerous discovery issues.

### b.      Expert Reports and Expert Discovery

78.      Lead Plaintiffs and the Individual Defendants each retained experts who analyzed and opined in expert witness reports (and, in certain cases, additional "rebuttal" reports) on issues of liability and damages.

### i.      Plaintiffs' Expert Stephen D. Prowse

79.      Lead Plaintiffs' expert Dr. Stephen D. Prowse – a former Senior Economist with the Federal Reserve, and currently a Senior Managing Director of FTI Consulting, Inc. – issued an expert report on April 3, 2006.  On May 22, 2006, Dr. Prowse submitted a rebuttal report responding to the opinions and analysis presented by Defendants' damages expert, Professor Christopher M. James, in Professor James' May 5, 2006 report.

80.      In his initial report, Dr. Prowse examined and compared the trading prices of the Debt Securities and the Bank Debt between 2000 and 2006, and analyzed how the prices of each class of debt fluctuated in response to material disclosures and developments during that period.  Dr. Prowse observed that, as Owens Corning advanced towards and declared bankruptcy in October 2000, the prices of the Debt Securities and the Bank Debt declined sharply, but always traded in tandem.  Dr. Prowse then observed that, following the corrective disclosures in early 2001, the trading prices of the Debt Securities  and the Bank Debt sharply diverged such that, between early

2001 and late 2004, the Bank Debt generally traded at prices twice as high as the Debt Securities. This divergence or "spread" in prices, Dr. Prowse opined, reflected the market's newfound understanding of the Debt Securities' structural subordination to the Bank Debt.

81.    Next, Dr. Prowse observed the impact of the October 2004 Bankruptcy Court ruling on "substantive consolidation" and the 2005 Third Circuit reversal of such ruling.  As indicated above, substantive consolidation meant that the Debt Securities would receive *pari passu* treatment with the Bank Debt in the Bankruptcy Proceeding.  Dr. Prowse observed that, following the Bankruptcy Court ruling, the spread between the prices of the Debt Securities and the bank debt predictably and dramatically narrowed.  Finally, Dr. Prowse observed, the spread dramatically widened once again in 2005 as, first, the Third Circuit Court of Appeals reversed the Bankruptcy Court's ruling, and, second, a new proposed Plan of Reorganization for Owens Corning provided that Bank Debt holders would receive a 150.3% recovery of their claims while Debt Securities holders would receive only 48.4%.

82.    Dr. Prowse opined that maximum statutory damages under Section 11 – which limits damages to the difference between the issue price and the security's price at the date of inception of the lawsuit – were $1.1 billion.  Offset for Class members' expected recovery through the Bankruptcy Proceedings, such damages, Dr. Prowse opined, were $780 million.  As Dr. Prowse made clear, this figure did not take into account Defendants' ability to show that some or all of the Debt Securities' price declines were caused by matters other than those at issue in this Litigation.[7]

---

[7]    Dr. Prowse also considered the difference between (1) the recovery that Debt Securities holders were expected to receive in the Bankruptcy Proceedings (48.4% of their claims,

(continued...)

83.     On May 22, 2006 Dr. Prowse issued a rebuttal report in which he countered and criticized the analysis and opinions proffered by in a May 5, 2006 report issued by Defendants' damages expert.

### ii.     Defendants' Damages Expert Christopher M. James

84.     On May 5, 2006, Defendants' damages expert Professor Christopher M. James – the William H. Dial/Sunbank Eminent Scholar and Professor of Finance at the University of Florida – submitted an expert report in which he opined that Class-wide damages were $0.

85.     Professor James opined essentially that: (i) SEC filings incorporated by reference into the registration statements for the Debt Securities adequately informed market participants of the allegedly undisclosed facts concerning the Subsidiary Guarantees and resulting structural subordination of the Debt Securities to the Bank Debt; (ii) the market's knowledge of the Subsidiary Guarantees explained why subsequent trading prices for the Bank Debt purportedly "always" exceeded the market prices for the Debt Securities; (iii) the  sole cause of the declines in the prices of the Debt Securities was Owens Corning's asbestos problem, which drove Owens Corning into bankruptcy; and (iv) an event study statistical analysis demonstrated no statistically-significant Debt Security price declines following the allegedly curative disclosures identified by plaintiffs.

86.     Professor James also criticized Dr. Prowse's analysis, methods, and damages opinions.  Professor James contended that Dr. Prowse's damages were legally and logically flawed,

---

[7](...continued)
as opposed to the bank debt holders' recovery of 150.3% of their claims) and (2) the amount that Debt Securities holders *would have received were their claims treated equally with those of the bank debt holders* (in which case all debt holders would receive 58.2% of their claims).  That calculation of Litigation-specific economic damages suggested aggregate damages of $93 million.

and overstated.  First, Professor James argued that Dr. Prowse's calculations of statutory damages were "grossly" overstated because they assumed that all of the Debt Securities' price declines were caused by the matters alleged in the Complaint. According to Professor James, all of the those price declines were caused, instead, by matters *other* than those complained of (specifically, by Owens Corning's asbestos liabilities).  Professor James also maintained that Dr. Prowse's statutory damages calculations were overstated because of errors that Dr. Prowse supposedly made in estimating the likely recovery for the Debt Securities claims in the Bankruptcy Proceedings.  Professor James also argued that Dr. Prowse's damages calculations failed to account for the fact that the Debt Securities had significantly recovered in market price.  Finally, Professor James criticized Dr. Prowse's calculation of economic damages specifically attributable to the alleged misrepresentations and omissions at issue in the Litigation.  Professor James argued that Dr. Prowse's calculations were inconsistent with Section 11, and that, even accepting Dr. Prowse's logic, calculation errors had overstated damages by $11 million.

### iii.    The Expert Rebuttal Reports on Damages

87.    On May 22, 2006, Dr. Prowse issued a rebuttal expert report opining on Professor James' expert report.  Dr. Prowse critiqued Professor James' analysis, methods and conclusions, and defended his own analyses and conclusions.  Primarily, Dr. Prowse argued that: (i) Professor James' arguments relating to the alleged "incorporation by reference" of information about the Subsidiary Guarantees did not address the undisputed failure to disclose the OCFT Transfer, which was highly material to purchasers of the Debt Securities; (ii) Professor James' analyses failed to account for or analyze the dramatic fluctuations in the *spread* between the trading prices of the Debt Securities and the Bank Debt as the market's understanding of the Debt

30

Securities' structural subordination evolved in light of disclosures made in the Bankruptcy Proceedings and the legal rulings by the Bankruptcy Court and the Third Circuit; (iii) Professor James' assertion that changes in the price spread merely resulted from changing market perceptions concerning Owens Corning's asbestos liabilities was without basis and was contradicted by the facts; and (iv) plaintiffs' statutory damages calculations complied with Section 11.

88.     Furthermore, Dr. Prowse computed the minimum amount of class damages assuming that Defendants were entirely successful in putting forth a complete affirmative defense of negative causation, i.e., assuming that the bulk of the price decline was caused by Owens Corning's asbestos problems.  Were Defendants so successful, Dr. Prowse opined, damages would still be the Debt Securities' pro rata share of the difference between the prices of the Credit Facility and Debt Securities.  He therefore allocated the spread in prices between the Credit Facility and Debt Securities to the two classes of debt instruments based on their relative balances as presented in the bankruptcy Disclosure Statement.  Pursuant to this methodology, Dr. Prowse computed damages by multiplying the spread as 39 percent (the proportion of the $950 million Debt Securities issued to the $2,417 million total Debt Securities and Bank Debt claims as of December 31, 2005).

89.     Based on this analysis, Dr. Prowse concluded that the minimum amount of damages that each plaintiff should be awarded if Defendants are completely successful in asserting an affirmative defense would be (a) 39 percent of the difference between (1) the price of the Credit Facility and (2) the price of the Debt Securities (both prices at the time of the commencement of lawsuit).  This calculation yielded aggregate damages of $105 million, to which interest at 12 percent per annum from the date the lawsuit commenced through the date of judgment could add a further $90 million.

90.     However, the $105 million computed by Dr. Prowse was only a theoretical *maximum*.  It was subject to reduction with respect to class members who sold their Debt Securities at prices above those prevailing on the date of commencement of this lawsuit.  This is because damages under Section 11 are limited to actual losses (that is, the difference between purchase price (or issuance price, if lower) and the sales price).  As a result of developments in the Bankruptcy Proceedings years after the Litigation commenced, the Debt Securities' prices significantly recovered.  The Debt Securities even traded at times above their issuance prices.  It is likely that a significant number of Class members sold their Debt Securities at such favorable prices and thus reduced or eliminated their Section 11 damages.

91.     On June 6, 2006, Professor James issued a rebuttal expert report reiterating his conclusion that damages were $0, responding to certain points raised by Dr. Prowse in Dr. Prowse's rebuttal report, and further critiquing Dr. Prowse's calculation methods.  Professor James' primary argument was that, under Section 11, defendants are allowed to limit their liability to the extent that they can show that price declines were caused by factors unrelated to the alleged fraud.  James argued that his report demonstrated that (i) the entirety of the price declines of the Debt Securities were caused by disclosures concerning asbestos liabilities; and (ii) the Debt Securities did not suffer any statistically significant price declines following the allegedly corrective disclosures identified by plaintiffs.  Additionally, Professor James noted, many Class Members, including Lead Plaintiffs, could not assert any damages at all given that they were still holding the Debt Securities and that the prices of the Debt Securities had recently recovered to trade at or above their issuance prices.

#### iv.      Defendants' Liability Expert Brian J. Lane

92.      On May 5, 2006, Defendants' liability expert Brian J. Lane – a Gibson, Dunn & Crutcher LLP partner specializing in corporate finance, disclosure, SEC federal securities law issues, and SEC enforcement areas, and formerly Director of the SEC's Division of Corporation Finance and legal counsel to then-SEC Chairman Arthur Levitt – submitted an expert report in which he opined on the meaning, practice and significance of the practice of "incorporation by reference" in SEC disclosures.   In Mr. Lane's expert opinion, the Individual Defendants had adequately disclosed all material information concerning the structural subordination of the Debt Securities through their "incorporation by reference" of the company's prior SEC filings in the registration statements.

93.      Lead Plaintiffs did not retain an expert to oppose Mr. Lane. Instead, Lead Plaintiffs moved to strike Mr. Lane's report and proffered testimony, as detailed below.

### c.      Summary Judgment

94.      Both Lead Plaintiffs and the Individual Defendants moved for summary judgment.

#### i.      Plaintiffs' Summary Judgment Motions

95.      On or about June 22, 2006, Lead Plaintiffs moved for summary judgment on liability concerning the non-disclosure of the OCFT Transfer, and for summary judgment with respect to loss causation and the existence of damages.

96.      As to liability, plaintiffs' summary judgment motion was simple.  Plaintiffs submitted that the structural subordination of the Debt Securities resulted from two factors –  the Subsidiary Guarantees *and* the OCFT Transfer – which combined meant that the Bank Debt would

enjoy substantive priority over the claims of the Debt Securities.  Plaintiffs argued that, even if the existence of the Subsidiary Guarantees was adequately disclosed in the offering materials through "incorporation by reference" as Defendants claimed, Defendants nevertheless did not and could not dispute that the OCFT Transfer remained secret until the conclusion of the Class Period.  Lead Plaintiffs contended that the OCFT Transfer was material information to Debt Securities investors, and thus that it was undisputed that the failure to disclose the OCFT Transfer in the registration statements for the Debt Securities rendered the offering materials materially misleading.

97.    In their separate summary judgment motion as to loss causation and damages, plaintiffs argued that Defendants' damages expert had essentially conceded these elements. Specifically, plaintiffs noted that Defendants' damages expert acknowledged that the spread between the lower-priced Debt Securities and the higher-priced Bank Debt came about as a direct result of the structural subordination of the Debt Securities.  Therefore, plaintiffs argued, there was no dispute that the claimed damages were caused by a materialization of the allegedly concealed risk, i.e., loss causation and the existence of damages, even if the precise amount of the resulting damages was disputed.

## ii.    Defendants' Summary Judgment Motions

98.    On June 23, 2006, the Individual Defendants filed separate motions for summary judgment as to liability and damages together with lengthy briefs and evidentiary appendices.

99.    As to liability, Defendants argued that, based on the testimony of Lead Plaintiffs' present and former employees, it was undisputed that Lead Plaintiffs' individual claims were subject to dismissal.  Defendants argued that: (i) Lead Plaintiffs' witnesses purportedly

"admitted" that Owens Corning adequately had disclosed the existence of the Subsidiary Guarantees by virtue of their disclosure in prior SEC filings "incorporated by reference" in the registration statements; (ii) Lead Plaintiffs' witnesses purportedly also acknowledged that the information contained in the prior SEC filings adequately informed investors that the Subsidiary Guarantees were "extremely valuable"; and (iii) plaintiffs failed to exercise appropriate "due care" and "diligence" before investing in the Debt Securities.  In short, according to the Individual Defendants, all necessary material information had been disclosed, and Lead Plaintiffs were at fault for failure to investigate.  Therefore, the Individual Defendants contended, the claims should be dismissed.

100.    As to damages, the Individual Defendants maintained that expert discovery proved beyond factual dispute that plaintiffs suffered no damages at all, and that, at best, plaintiffs could only argue for as-yet unproven damages of no more than $1.5 million.  The Individual Defendants first observed that, as of the date of their motion, the Debt Securities were trading at prices above the issue prices, and suggested that Lead Plaintiffs and many other Class members did or could have sold their Debt Securities at a profit.  Second, the Individual Defendants contended that Section 11's "negative loss causation" affirmative defense – pursuant to which defendants may limit damages by showing that some or all of the subject security's price decline resulted from factors other than the matters complained of – disposed of all (or essentially all) of the damages claimed by plaintiffs.  Specifically, the Individual Defendants argued that the *entire* decline in the prices of the Debt Securities occurred *prior to* the allegedly corrective disclosures.  Hence, the Individual Defendants maintained that such decline was caused solely by previous market concerns over Owens Corning's asbestos liabilities.  At best, Defendants argued, plaintiffs could point only to a 0.15% decline in the prices of the Debt Securities in reaction to the allegedly corrective

disclosure – a decline that Defendants' expert found statistically insignificant. Therefore, Defendants urged the Court to grant summary judgment because plaintiffs could not prove damages, or, in the alternative because plaintiffs' damages were limited to no more than a 0.15% decline (which in dollar terms amounted to a $1.5 million Class-wide loss).

### d.    Lead Plaintiffs' Pre-Trial Motions

101.    In addition to their summary judgment motions, Lead Plaintiffs – looking to advance their position in upcoming trial – filed several pre-trial motions.

### i.    ... To Preclude the Expert Report and Testimony of Defendants' Expert Brian J. Lane

102.    First, Lead Plaintiffs moved to strike the purported export report and testimony of Defendants' expert Brian J. Lane.  As indicated above, Mr. Lane opined (*see* ¶ 92, *supra*) as an expert on the meaning, practice and significance of the practice of "incorporation by reference" in SEC disclosures.  Mr. Lane opined that registration statements for the Debt Securities adequately "incorporated by reference" all of the allegedly omitted and misrepresented information complained of by plaintiffs.

103.    In their motion to strike, Lead Plaintiffs argued that the proffered expert testimony of Mr. Lane was inadmissible under Rule of Evidence 702, as such testimony did not consist of evidence or facts that would assist the jury (the proper role of an expert), but rather purported to describe the law and its application (matters that are reserved to the Court and may not be usurped by expert testimony).  Plaintiffs noted that the Court had already indicated at the last conference that it would not admit such purportedly "expert" testimony on the law.  Therefore, plaintiffs urged, such "expert" testimony was not admissible expert evidence and should not be presented at trial.

36

### ii.  ... To Preclude Defendants' Assertion of a Due Diligence Defense at Trial Based on "Reliance on Counsel"

104.    Second, Lead Plaintiffs filed a motion *in limine* to preclude the Individual Defendants from introducing testimony or evidence in support of any "reliance on counsel" defense. As indicated above, the Individual Defendants' third and fourth affirmative defenses were based on alleged "due diligence", *i.e.*, that they had "reasonable grounds to believe" that the registration statements were free of untruth and/or error.   Ordinarily, this defense is established by showing that the individual defendant relied on "advice of counsel" in believing that the disclosures in the registration statements were adequate.   Plaintiffs argued, however, that in discovery the Individual Defendants had asserted blanket attorney-client privilege with respect to all communications between them and Owens Corning's counsel.   Consequently, Lead Plaintiffs submitted that Defendants should be precluded from asserting this defense.   As plaintiffs noted, Defendants could not use attorney-client privilege as both sword and shield.   Since Defendants had already raised the claim of privilege to thwart plaintiffs' discovery efforts, they should not be entitled to introduce "reliance on counsel" evidence at trial. Without such evidence, it was impossible for them to advance the defense of "due diligence."

### iii.  ... To Preclude Defendants' "Incorporation By Reference" and "Failure to Exercise Due Care" Defenses

105.    Third, Lead Plaintiffs filed a motion to Strike Defendants' Eighth and Ninth Affirmative Defenses and to Preclude the Offer of Any Evidence or Argument Based on "Incorporation by Reference" or an Investor's Duty of "Due Care."   By means of this motion, Lead Plaintiffs sought to foreclose two of Defendants' principal defenses.

106.    As indicated above, the Individual Defendants maintained that Lead Plaintiffs

37

had failed to exercise "due care" in investing in the Debt Securities.  Such failure, according to the

Individual Defendants, arose because plaintiffs failed to review certain information supposedly

"incorporated by reference" into the registration statements relating to the Subsidiary Guarantees.

Defendants argued that such "incorporated" information adequately alerted investors to the existence

of the Subsidiary Guarantees and to the fact that the Subsidiary Guarantees were of "significant

value."

107.    Lead Plaintiffs argued in their motion to strike that a purported lack of "due

diligence" by a plaintiff does not constitute a legally cognizable defense under the Securities Act.

 As Lead Plaintiffs submitted, Section 11 of the Securities Act does not require purchasers to

exercise due care, conduct any investigation, or engage in any due diligence.

108.    Lead Plaintiffs also sought to preclude Defendants' purported "incorporation

by reference" defense.  As plaintiffs argued, under the SEC's integrated disclosure system, the

allegedly omitted information – concerning the Subsidiary Guarantees and the OCFT Transfer – was

not incorporable by reference. It was a type of information specifically required to  be "presented

in full in the prospectus delivered to investors". Because the Debt Securities were issued using Form

S-3, the "description of the securities to be registered" should have been "presented in full in the

prospectus delivered to investors" and should have included a "description" of any "subordination"

or "priority."  Further, Lead Plaintiffs contended that Defendants' "incorporation by reference"

defense was without merit because it improperly relied on prohibited "double" incorporation and

did not otherwise comply with applicable regulations for the use of incorporation by reference.

### iv.    ... To Preclude the Expert Report and Testimony of Defendants' Damages Expert Christopher M. James

109.    Plaintiffs also moved to preclude from the trial the expert testimony and

report of Dr. Christopher James on the grounds that his proffered expert evidence failed Fed. R.

Evid. 702's standards for admission of expert evidence.  Lead Plaintiffs argued that the proffered

testimony failed the tests of reliability and relevancy and, additionally, that it should be excluded

under Fed. R. Evid. 403 due to its propensity to confuse.

110.    In particular, Lead Plaintiffs argued that Professor James' analyses wilfully

ignored relevant facts and relied on a blinkered and reductive subset of data.  Specifically, plaintiffs

observed that the misrepresentations and omissions complained of concerned the *relative* value of

the Debt Securities – i.e., their rank in Owens Corning capital structure *relative to* the Bank Debt.

Professor James thus improperly ignored the relative prices of the Debt Securities and the Bank

Debt, and refused to analyze the facts in the appropriate relative-value framework (in which the

spread that developed between the Debt Securities and the Bank Debt in reaction to the corrective

disclosure is an economically appropriate measure of damages).  Instead, Professor James

improperly only evaluated the price reaction of the Debt Securities on an absolute basis following

the corrective disclosures.  Accordingly, plaintiffs argued that Professor James' conclusions were

invalid, and that his testimony did not qualify as properly helpful "expert" evidence.

### e.    Trial Preparation

111.    With trial visible on the horizon, and with summary judgment, *Daubert*, and

other pre-trial motions well underway, Lead Plaintiffs began to prepare for trial, drafting, *inter alia*,

witness and exhibit lists, proposed jury instructions, and a pre-trial order.  In addition, plaintiffs

began preparing motions for the admission in evidence of prior testimony taken of defendants and

Owens Corning in the Bankruptcy Proceedings.

### 10.     The Individual Defendants Settlement

112.     With the above-mentioned cross-motions for summary judgment pending (*see* ¶¶ 94-100, *supra*), as well as plaintiffs' additional pre-trial and *Daubert* motions (*see* ¶¶ 101-110, *supra*) pending, and with a motion hearing set for September 27, 2006, Lead Plaintiffs and the Individual Defendants again explored settlement.

113.     On September 21, 2006, Lead Plaintiffs and the Individual Defendants mediated face-to-face before Jonathon Marks, Esq. and subsequently reached an agreement-in-principle to settle all claims between them in this Litigation, in which in exchange for a release of the claims against them, the Individual Defendants would pay $11 million.

114.     As with the Underwriter Settlement, agreement on a final settlement between the Lead Plaintiffs and the Individual Defendants was achieved only after months of further negotiation, and after the exchange, modification and rejection of numerous drafts of the stipulation of settlement and related documents.  Matters were further complicated by the fact that certain terms of the Underwriter Settlement, drafts of which had just been finalized at the time of the agreement-in-principle between Lead Plaintiffs and the Individual Defendants, became immediately irrelevant, inapplicable, and/or outdated by the settlement of plaintiffs' claims against the Individual Defendants.  Therefore, at the same time as Lead Plaintiffs were negotiating the documentation of the settlement with the Individual Defendants, Lead Plaintiffs were also negotiating a supplemental stipulation of settlement with the Underwriter Defendants to harmonize it with current developments.  Lead Plaintiffs, the Underwriter Defendants and the Individual Defendants all cooperated on drafts of a new proposed notice to the Class informing Class members of the pendency and *full* settlement of the Litigation, as well as a claim form to be issued to Class

members, and a plan of allocation of the settlement funds.

115.    On March 28, 2007, Lead Plaintiffs and the Individual Defendants finalized and executed a stipulation of settlement (the "Individual Defendants Stipulation") in which, in exchange for the release of plaintiffs' claims, the Individual Defendants would provide a payment of $11 million in cash (the "Individual Settlement").   Additionally, on March 28, 2007, Lead Plaintiffs, the Individual Defendants and the Underwriter Defendants finalized and executed a supplemental stipulation of settlement (the "Supplemental Stipulation") harmonizing the previously-reached Underwriter Settlement with subsequent developments in the Litigation and with the Individual Defendants Settlement.

## II.    THE TERMS OF THE SETTLEMENT AND THE PLAN OF ALLOCATION

### A.    The Settlement

116.    The Settlement provides that, in full and complete settlement of the claims that have or could have been asserted against Defendants, the Defendants will pay or cause to be paid, into an escrow account, cash in the amount of nineteen million, two hundred and fifty thousand dollars ($19,250,000.00) that will earn interest for the benefit of the Class (the "Settlement Fund"). As agreed by the Parties in their settlement negotiations, the Underwriter Defendants have already deposited $8.25 million into the Settlement Fund, while the remaining $11 million will be provided by the Individual Defendants upon grant of final approval of the Individual Defendant Settlement.

117.    The Settlement Fund, less all taxes, approved costs, fees and expenses (the "Net Settlement Fund") shall be distributed on a *pro rata* basis, as described in the Plan of Allocation discussed below, to members of the Class who submit timely and valid Proofs of Claim ("Authorized Claimants").   Class members have until October 10, 2007 to file valid and timely

proofs of claim in order to participate in the Settlement.

118.     Upon the Court's approval of the Settlement, Lead Plaintiffs and Class members will release, and shall be enjoined from prosecuting, Defendants and related parties for all claims that were or could have been asserted in the Litigation.  The exact terms of such releases were agreed to by all Parties after lengthy settlement negotiations, and are disclosed in the Stipulations as well as in the Notice and the Proofs of Claim mailed to Class members.

### B       The Plan of Allocation

119.     The proposed Plan of Allocation, as set forth in the Notice mailed to Class members, will govern the *pro rata* allocation of the Settlement Fund among Authorized Claimants through determination of a "Recognized Loss" calculated for each Authorized Claimant.  The Claims Administrator shall determine each claimant's Recognized Loss based upon information supplied in the claimant's Proof of Claim.

120.     The calculation of claimants' Recognized Losses is simple and transparent: the difference between price paid in purchasing the Debt Securities and the price received in selling or redeeming the Debt Securities.[8]  This results in Recognized Losses that are exactly coextensive with each Class member's actual economic losses and essentially coextensive with each Class member's legally-cognizable damages.

121.     Here, as to liability, the claims of various Class members do not vary in

---

[8]     For Debt Securities purchased during the Class Period and redeemed in connection with Owens Corning's Sixth Amended Joint Plan of Reorganization (effective on October 31, 2006), the Recognized Loss is the difference between (i) the expenditure incurred in the purchase of the Debt Securities; and (ii) 58.4% of the face value of such redeemed Debt Securities (i.e., the percentage recovery received by bondholders pursuant to Owens Corning's Sixth Amended Joint Plan of Reorganization).

strength according to the dates of their purchase of the Debt Securities (as often happens in class actions spanning multiple years).  All Class Members, no matter when they purchased the Debt Securities, were equally misled by the same alleged material misrepresentations and omissions; there were no partial corrective disclosures during the Class Period that could serve to distinguish the quality of Class members' claims; and corrective disclosure occurred only *after* the end of the Class Period.  Therefore, no artificial adjustments, formulas or weightings need be introduced to allocate more to some Class members than to others.

122.    As in almost all class actions, it is damages that vary. Variation here is simple and one-dimensional: there are no qualitative or categorical differences among Class members, but rather only the minor factual specifics of each Class member's dates of purchase and sale of the Debt Securities (which largely determine the prices paid and received for the Debt Securities).  The Plan of Allocation takes these differences into account, directly and exactly.  Class members whose losses are greater – for example, Class members who purchased the Debt Securities at higher prices (in the original offerings of the Debt Securities, for example); or Class Members who sold the Debt Securities at lower prices – will report correspondingly greater Recognized Losses and receive correspondingly greater allocations of the Net Settlement Fund.

123.    The Plan thus equitably allocates losses to Class members in accordance with the structuring facts here – uniform claims as to liability, varying economic losses determined by each Class member's dates of purchase and sale, and statutory damages that parallel economic losses.

43

## III.    EVALUATION OF THE SETTLEMENT

124.    As detailed above, the Settlement was reached through protracted, detailed arm's-length negotiations (*see* ¶¶ 72-75 and 112-115, *supra*) between the Parties, who, after four years of motion practice and discovery (*see* ¶¶ 30-111, *supra*), were thoroughly familiar with all parties' claims and defenses, and with all attendant merits and risks.  The Settlement provides the Class with a substantial and demonstrably superior recovery (approximately 18.2% of *maximum* possible damages, and likely a significantly greater percentage of realistically provable damages) that is several multiples of class action norms.  Perhaps consequently, not a single Class member has chosen to exclude themselves from the Class, and not a single Class member has objected in any way to any aspect of the Settlement.   This absence is all the more noteworthy given that Class members here – large, sophisticated and experienced financial institutions – are precisely those with the greatest ability and inclination to mount objections when warranted, or to opt-out when in their interest.

125.    The recovery provided by this Settlement is both immediate and certain.  The only certainties provided by the alternative – continued litigation – would be a sharp and certain rise in costs to all Parties as the claims proceeded to trial, and delayed resolution of plaintiffs' claims for years (given post-trial proceedings and appeals).  The significant uncertainties of continued litigation – especially the substantial risks and challenges to plaintiffs' claims as to both liability and damages – presented the real possibility that even were the Litigation to continue, plaintiffs may well have recovered less than through this Settlement, or even nothing at all.  For all these reasons, it is the informed opinion of Lead Plaintiffs and their counsel that the Settlement is fair, reasonable and adequate and thus merits this Court's final approval.

44

A.      **Standards**

126.    In assessing class action settlements, First Circuit courts have often divided their analyses into an initial examination of "procedural" adequacy followed by a subsequent examination of "substantive" adequacy.  A finding of procedural adequacy confers a strong presumption that the Settlement is substantively fair, reasonable and adequate.

127.    The hallmarks of procedural adequacy are well established:  (1) arm's-length settlement negotiations; following (2) discovery sufficient to inform the parties of the relative merits and risks of their claims.

128.    The hallmarks of substantive adequacy have not been articulated by the First Circuit.  However, in assessing the fairness, reasonableness and adequacy of class action settlements, district courts in the First Circuit have adopted the Second Circuit's long-standing nine-factor test (first elaborated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)) either wholesale[9] or in condensed six-factor form.[10]

129.    The nine factors originated by *Grinnell* and used thereafter for evaluating the fairness of a proposed class action settlement are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the

---

[9]      *See, e.g., In re Lupron Marketing and Sales Practices Litigation,* 228 F.R.D. 75, 93-94 (D. Mass. 2005);  *In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 72 (D. Mass. 2005).

[10]     *See, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 197, 206 (D. Mass. 2003);  *Sylvester v. Cigna Corp.*, 369 F.Supp.2d 34, 44-45 (D. Me. 2005); *Nilsen v. York County*, 382 F.Supp.2d 206, 212 (D. Me. 2005).

defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of the litigation.

### B. The Settlement's Procedural Fairness Confers a Strong Presumption of Substantive Fairness

130.    The hallmarks of procedural adequacy – (1) discovery sufficient to inform the parties of the relative merits and risks of their claims, followed by (2) a settlement negotiated at arm's-length – are present here.

131.    The Settlement was reached with trial fast approaching after more than four years of litigation (as detailed in ¶¶ 25-115, *supra*), including substantial discovery efforts by Lead Plaintiffs and Defendants (¶¶ 59-71, 78-93, *supra*). Years of adversarial litigation served thoroughly to inform Lead Plaintiffs and their counsel of the strengths and weaknesses of plaintiffs' claims and of Defendants' arguments and defenses. At the time of Settlement, therefore, Lead Plaintiffs and their counsel possessed the information necessary to evaluate the relative merits of each side's case with respect to both liability and damages. So informed after four years of adversarial litigation, the Parties and their counsel then proceeded to negotiate what became the Settlement.

132.    The arm's-length nature of the settlement negotiations are a matter of evident record.

133.    As an initial matter, both settlements – with the Underwriter Defendants and with the Individual Defendants – emerged from formal mediation overseen by third-party mediators. On November 2, 2005, Lead Plaintiffs and the Underwriter Defendants mediated face-to-face before Honorable Layn Phillips, a former United States District Court Judge, and subsequently reached an agreement-in-principle to settle all claims between them. On September 21, 2006, Lead Plaintiffs

and the Individual Defendants mediated face-to-face before Jonathon Marks, Esq. and subsequently reached an agreement-in-principle to settle all claims between.

134.     Second, as the Court is aware, the negotiations required for the Parties to reach  final settlement agreements (i.e., the Stipulations) were lengthy.   Both the Underwriter Settlement and the Individual Defendants Settlement had their genesis in an "agreement-in-principle" reached after formal mediation, and their culmination in executed Stipulations. However, the negotiations translating the former into the latter required many months in each case.   For example, although Lead Plaintiffs and the Underwriter Defendants reached an agreement in principle to settle their claims in November 2005, Lead Plaintiffs and the Underwriter Defendants needed ten months of further negotiations – involving the exchanges of numerous drafts and edits of settlement-related documents addressing numerous issues of contention, including the structure and language of notice to the class, the scope and terms of the releases granted to Defendants, and the conditions and timing of the Defendants' funding of the Settlement Fund – before agreement was reached and the Stipulation signed.   That scenario was repeated with the Individual Defendants in connection with the Individual Defendants Settlement: following a September 2006 mediation, Lead Plaintiffs and the Individual Defendants required six months of further negotiations – and the exchange of additional drafts and edits of settlement-related documents – before agreement was reached on the terms of the documentation.

135.     Third, settlement negotiations were not merely arm's-length but matters of contentious dispute.   Throughout the settlement negotiations, Lead Plaintiffs adamantly advanced the Class' interests.   Furthermore, as the Court is aware, when settlement negotiations did not appear to be advancing the Class' interests, Lead Plaintiffs were prepared  to – and voiced their intention

to – abandon settlement negotiations and return to active litigation of the Class' claims.

136.   Collusion is a non-issue here.  Lead Plaintiffs – institutional investors who invested more than $40 million in the Debt Securities – initiated this action, retained counsel well-experienced in securities class action litigation, and advanced this Litigation thereafter for years and through many risks until adequate resolution was secured.  The entire record of the Litigation (in which, for example, Lead Plaintiffs produced hundreds of pages of internal documents submitted to numerous depositions of their present and former employees) and of the settlement negotiations bears witness to Lead Plaintiffs' pursuit and advancement of the Class' claims.

137.   In sum, the Settlement is the result of the Parties and their respective counsel – all of whom were fully informed concerning the merits and risks of the Litigation as a result of years of adversarial litigation – negotiating hard and at arm's length for many months before reaching agreement on the Settlement.  The Settlement is thus eminently and evidently procedurally adequate, thus meriting a strong presumption of substantive fairness.

### C.   Factors to Be Considered in Support of Settlement

138.   Below, we measure this Litigation and Settlement using each of the factors considered by District Courts in the First Circuit (*see* ¶¶ 128-129, *supra*) in determining the adequacy of class action settlements.

139.   These factors strongly support this Settlement.  This Settlement was achieved after lengthy, detailed, arm's-length negotiations by experienced counsel who, after more than four years of litigation including substantial discovery and motion practice, possessed full knowledge of the strengths and weaknesses of all Parties' claims, defenses, evidence and arguments (*see* Section III.C.3 and ¶¶ 155-157, *infra*). The recovery achieved here, both in light of the highest possible and

likely provable recovery and in light of the attendant risks, is excellent (*see* Section III.C.7 and ¶¶ 189-195, *infra*).  The Class reaction here demonstrates the Class's thorough satisfaction with the Settlement (*see* Section III.C.2 and ¶¶ 149-154, *infra*).  The substantial risks plaintiffs faced were they to continue with the Litigation (*see* Sections III.C.4 and III.C.5,  ¶¶ 158-184, *infra*) promised only two certainties – lengthy delays and sharp increases in expenses for all Parties and the Court (*see* Section III.C.1 and ¶¶ 140-148, *infra*) – without any corresponding certainty of greater recovery, or indeed of any recovery at all (*Ibid.*).

### 1.     Complexity, Expense and Likely Duration of the Litigation

140.    Securities class actions are deemed among the most complex legal proceedings.  This Litigation featured all the normal difficulties of complex securities litigation, as well as certain unique twists (discussed in Sections III.C.4 and III.C.5, *infra*, detailing the risks plaintiffs faced with respect to liability and damages) adding to the complexity.

141.    As to liability, the Litigation would have required a jury to make findings on sophisticated financial and factual matters that are usually the province of sophisticated institutional investors and trained financial and/or legal experts.  Such matters include: (1) what disclosures the registration statements for the Debt Securities contained, whether directly and/or through incorporation by reference; (2) whether the registration statements adequately disclosed the allegedly omitted matters to the Class;  (3) whether the omission of the OCFT Transfer was a material omission that rendered the registration statements misleading; (4) whether the allegedly misrepresented and/or omitted information was material; and (6) whether Defendants' purported "due diligence" or "reasonable belief" in the registration statements' material accuracy negated liability.

142.     As to damages, matters were at least equally and perhaps more complex.  A jury faced with this Litigation would have had to have sifted the competing claims, often rooted in statistical arcana, of plaintiffs' and defendants' damages experts – both of whom were Ph.D. economists formerly employed by the Federal Reserve system in senior positions.  This battle of the experts would present the jury with disparate and contradictory opinions about, *inter alia*: (1) the behavior of the prices of Owens Corning's Debt Securities and Bank Debt; (2) the causes of the price behavior of the Debt Securities and the Bank Debt; (3) the role of Owens Corning's asbestos liabilities in the price declines suffered by Owens Corning's Debt Securities; (4) whether or not damages could be measured in relative terms (as plaintiffs argued) or absolute terms (as Defendants argued); (5) if measured in absolute terms, exactly what portion of the Debt Securities' price declines could be attributed to the matters complained of (or conversely, what portion of the Debt Securities' price declines would have to be attributed to matters *other than* those complained of, such as Owens Corning's asbestos problems); (6) whether or not the "spread" between the prices of the Debt Securities and the Bank Debt constituted the measure of damages; and (7) and exactly when and how to measure such spread.

143.     In making such deliberations, the jury would have to have had to sift complex documentary evidence  – e.g., lengthy registration statements, credit agreements, expert statistical analyses, and other materials normally assessed by sophisticated investors, accountants and lawyers – often contradicted by other documentary evidence and witness testimony.

144.     Continued litigation would, therefore, have required resolution of numerous complex issues through parsing of complex and abstruse factual and expert evidence.  A jury's resolution of such issues was impossible to predict, and presented numerous and significant risks

to plaintiffs (and Defendants).  For example, a jury could find that Defendants had made adequate disclosure in the registration statements, or that Defendants had made omissions but that such omissions were not material.  Even had a jury found for plaintiffs as to liability, it would still be very possible that the same jury would find that plaintiffs had not suffered any damages, or that plaintiffs' damages were minimal.

145.    The complexities of the matters at issue in the Litigation made continuing the Litigation a matter of great uncertainty for all Parties.  The only certainties resulting from continued litigation were negative ones: (1) a sharp, immediate and substantial rise in the costs of this action, both as born by the Parties and as born by the court system; and (2) a delay of resolution that could last years as the Litigation continued through trial, post-trial proceedings, and appeals.

146.    At time of settlement, four cross motions for partial and full summary judgment were pending, as were several further pre-trial and *in limine* motions (including two complex *Daubert* motions concerning expert evidence).  Resolution of these motions and issues alone could have required substantial *Daubert* hearings as well as lengthy pre-trial hearings.  Additionally, plaintiffs were preparing for trial, readying exhibit lists, witness lists, proposed jury instructions, and a pre-trial order – efforts which often lead directly to further motion practice, disputes between parties, and multiple Court hearings. Trial would likely have occupied several weeks at least, with post-trial motions and appeals guaranteed to follow.  All this would have required substantial investment of lodestar and expense by the Parties, and would have consumed significant amounts of the Court's time.

147.    Continuing the Litigation would thus have meant a sharp and certain rise in litigation costs without any corresponding certainty for a sharp (or any) rise in recovery.  On the

contrary, continuing the Litigation could well have resulted in a lesser recovery or no recovery at all (as detailed in Sections III.C.4 and III.C.5, *infra*). And even were the outcome of trial favorable to plaintiffs, at best, years of further delay would be virtually guaranteed through post-trial motions and appeals. Any favorable verdict for plaintiffs at trial could be overturned by the Court on post-trial briefing or through appeals.

148.    Given the complexity of the issues presented by this Litigation, the impossibility of predicting their resolution, the substantial and guaranteed further expenditures of time and money and Court resources were this case to proceed to trial with no certainty of ultimately producing a recovery equal to or better than that achieved by this Settlement, Lead Plaintiffs and their counsel submit that the Settlement merits the Court's approval.

## 2.    Reaction of the Class to the Settlement

149.    The reaction of the Class to the settlement is one of the more direct and concrete indicators of a settlement's fairness and adequacy. If a settlement produces a large number of objections or requests for exclusion from the class ("opt outs"), class dissatisfaction is signaled, suggesting that the settlement may be inadequate. Conversely, a small number of objections or opt outs signals class satisfaction with the settlement and suggests therefore that the settlement is adequate.

150.    Here, more than 5,900 copies of the Notice and Proof of Claim were sent to potential Class members . *See* Affidavit of Jose C. Fraga Re:  (A) Mailing of the Notice and the Proof of Claim; and (B) Report on Exclusion Requests Received (the "Mailing Affidavit"), ¶ 7. A Summary Notice was published on May 10, 2007, in the national edition of THE WALL STREET JOURNAL (*id.*, ¶ 5 and Exhibit B), and distributed as well via press release issued on the same day

through Business Wire (*i.d.*, ¶ 5 and Exhibit).  The Notice informed Class Members of their rights

opt out or to object, and of the procedures for doing so.  The opt-out and objection deadline, as the

Court ordered and the Notice informed, was July 10, 2007.

151.    Not a single Class member opted out.  (Mailing Affidavit, ¶ 8).

152.    No Class Member has objected in any way to the Settlement, the Plan of

Allocation, or the Fee Request.

153.    The absence of objections or opt outs indicate a very high degree of Class

satisfaction with this Settlement and the gross and net recovery it provides.

154.    Such satisfaction is all the more significant here, given that the Debt

Securities were purchased exclusively (or almost exclusively) by large, sophisticated institutional

investors.  Such investors most probably made sizeable investments in the Debt Securities (e.g.,

Lead Plaintiffs purchased more than $40 million of the Debt Securities), and thus have strong

interests in these proceedings and in the Settlement.  Moreover, such investors ordinarily retain able

counsel that can and do make their views known.  The silence of such a class – i.e., the lack of

objections or opt-outs from those most capable and most motivated to object or opt-out – is a strong

indicator that the Class views the Settlement as fair, adequate and reasonable.

### 3.    Stage of the Proceedings and the Amount of Discovery Completed

155.    This factor recapitulates the "procedural" fairness factor analyzed earlier (*see*

Section III.B and  ¶¶ 130-137, *supra*).  The concern is identical: to determine whether the parties

had sufficient information to make informed decisions as to the terms of settlement.

156.    At the time the Settlement was reached, plaintiffs were preparing for

impending trial.  This Declaration details four years' worth of litigation that preceded the Parties'

settlements in 2006 and 2007 – Lead Plaintiffs initiated the Litigation in April 2001 (¶¶ 25-26); amended and strengthened their Complaint later in 2001 (¶¶ 27-29); successfully opposed Defendants' two separate motions to dismiss and sustained all their claims in 2002 (¶¶ 30-35); secured certification of the Class in 2004 over Defendants' opposition and after class certification discovery, which included document productions from and deposition of the Lead Plaintiffs (¶¶ 38-48); engaged in substantial discovery, including the review of thousands of pages of documents, taking and defending depositions, and the exchange of multiple sets of interrogatories, between 2003 and 2006 (¶¶ 59-71); retained experts, and engaged in expert discovery during 2005 and 2006 (¶¶ 78-93); filed two motions for partial summary judgment in mid-2006, and opposed the Individual Defendants' two motions for summary judgment (¶¶ 94-100); filed further pre-trial, *Daubert* and *in limine* motions in mid-2006 (¶¶101-110); and began trial preparations, including a pre-trial order, witness and exhibit lists, and proposed jury instructions (¶¶ 111).  In addition, Lead Plaintiffs engaged in the lengthy, hard-fought negotiations required to reach Settlement (*see* ¶¶ 132-137; 72-75, 112-115; and Section III.B, *supra*).

157.    In sum, the Settlement here was not premature.  Both plaintiffs and Defendants were afforded full opportunity to develop their cases through thorough fact and expert discovery; to advance their arguments and contest each others' arguments (through motions to dismiss, motions for class certification and four summary judgment motions) and to fine tune their arguments and attempt to carve away at the edges of their opponents' arguments through further pre-trial, *in limine* and *Daubert* motions.  No stone has been left unturned.  The Parties, in full knowledge of the strengths and weaknesses of their case and that of their adversaries, agreed to this Settlement.

54

### 4.      Risks of Establishing Liability and Damages

158.      Plaintiffs faced very significant risks, as to both liability and damages, in continued litigation of their claims.

### a.      General

159.      At the time of Settlement, two summary judgment motions against plaintiffs were pending (as detailed in ¶¶ 98-100, *supra*), seeking dismissal of the Litigation on both liability and damages grounds.  Although Lead Plaintiffs believed that their claims were meritorious, and although Lead Plaintiffs had anticipated most of Defendants' summary judgment arguments and had sought to address them through various motions for partial summary judgment and other pre-trial motions (as detailed in ¶¶ 95-97, 101-110, *supra*), there remained a real risk that plaintiffs' claims would not survive to reach trial.  An adverse ruling or rulings at summary judgment could have hobbled plaintiffs' case or disposed of it entirely.

160.      Even were Lead Plaintiffs to have successfully shepherded plaintiffs' claims past Defendants' summary judgment challenges, Lead Plaintiffs would have had to have faced the same liability and damages risks with magnified intensity (given the heavier burden of proof imposed) at trial.  Again, while Lead Plaintiffs believed their claims meritorious, and although Lead Plaintiffs had filed a barrage of pre-trial, *Daubert* and *in limine* motions to weaken Defendants' position at trial (as detailed in ¶¶ 101-110, *supra*), Defendants had always vigorously contested liability and damages and it was entirely possible that Defendants could convince a jury to find in their favor.  Furthermore, the complexity of the issues involved (as detailed in ¶¶ 140-148, *supra*) rendered the outcome of any jury trial, already inherently uncertain, all the more difficult to predict.

### b.       Specific Liability Risks

161.    As to liability, plaintiffs faced the burden of persuading the Court on summary judgment and the jury at trial that the registration statements for the Debt Securities omitted and/or misrepresented material information concerning the structural subordination of the Debt Securities, that as a result of such material omissions and/or misrepresentations the registration statements were materially misleading.

162.    As indicated above, the primary risk for plaintiffs as to liability was Defendants' claim that the registration statements were free of omission and error because they "incorporated by reference" prior Owens Corning SEC filings which supposedly disclosed the allegedly omitted information.

163.    Specifically, Defendants argued that the registration statements had incorporated by reference other documents which disclosed the existence of the Subsidiary Guarantees and revealed that the Subsidiary Guarantees possessed "significant value."  Thus, Defendants argued that the structural subordination of the Debt Securities was adequately disclosed. Defendants cited legal authority to support their "incorporation by reference" claims, and retained an expert who opined on the validity and effect of such incorporation by reference.  The expert's authority was substantial: six years spent in the SEC's Division of Corporate Finance as special counsel in the Office of Disclosure Policy; three years spent as legal counsel to SEC Commissioner Richard Roberts (reviewing SEC rulemaking and enforcement, advising on policy); one year as legal counsel to SEC Chairman Arthur Levitt; and three years as the SEC's Director of the Division of Corporation Finance.

164.    As detailed above, plaintiffs contended that Defendants' "incorporation by

reference" defense lacked merit in a motion for partial summary judgment and other motion papers (detailed in ¶¶ 96, 102-103, 105-108, *supra*).

165.    Plaintiffs argued, for example, that under the SEC's integrated disclosure system, the allegedly omitted information concerning the Subsidiary Guarantees and OCFT Transfer was *not* incorporable by reference.   Because the Debt Securities were issued using Form S-3, the "description of the securities to be registered" should have been "presented in full in the prospectus delivered to investors" and should have included a "description" of any "subordination" or "priority."   Further, Defendants' "incorporation by reference" was without merit because it improperly relied on prohibited "double" incorporation and did not otherwise comply with applicable regulations for use of incorporation by reference.

166.    Additionally, Lead Plaintiffs filed a *Daubert* motion to preclude from trial Mr. Lane's expert report and proffered testimony on incorporation by reference (*see* ¶¶ 102-103, *supra*). Plaintiffs contended that Mr Lane's opinions were not properly admissible "expert" opinions, but impermissible legal conclusions.

167.    Lead Plaintiffs also filed a motion for partial summary judgment as to Defendants' liability (*see* ¶ 96, *supra*).   There, Lead Plaintiffs argued that Defendants disingenuously were focusing on the alleged non-disclosure of the Subsidiary Guarantees, while overlooking the undisputed non-disclosure of the OCFT Transfer.   As Lead Plaintiffs submitted, plaintiffs were entitled to summary judgment with respect to the non-disclosure of the OCFT Transfer because it was undisputed that (i) the registration statements omitted to disclose the relevant facts, and (ii) a reasonable investor would have considered them significant in deciding whether to invest in the Debt Securities. This was because, given the Subsidiary Guarantees

(including that of OCFT), the OCFT Transfer meant that a significant amount of Owens Corning's assets (the bulk of its intellectual property) would be subject to a senior claim in the event of Owens Corning's insolvency.

168.    In addition to the "incorporation by reference" defense, Defendants advanced several further challenges to plaintiffs' liability claims, all of which were still unresolved at the time of Settlement.   An adverse decision or finding on summary judgment would have weakened plaintiffs' position at trial, or prevented plaintiffs from trying their claims altogether.   Even had plaintiffs overcome such challenges at summary judgment in part or in full, there remained the real possibility that Defendants could convince a jury that their liability was not merited.

169.    For example, Defendants maintained that Lead Plaintiffs' individual claims should be dismissed because of Lead Plaintiffs' purported failure to exercise "due care."  Referring to the deposition testimony of certain of Lead Plaintiffs' present and former employees, Defendants argued that Lead Plaintiffs purportedly "admitted" that the offering materials disclosed the allegedly omitted facts (through "incorporation by reference"), and that Lead Plaintiffs simply had failed to do their homework.  Defendants argued that a Wall Street analyst, apparently having conducted a deeper investigation of the publicly available information than Lead Plaintiffs, had managed to ascertain the relevant facts and published them in a report (albeit near the conclusion of the Class Period).   Defendants also pointed out that Lead Plaintiffs were extremely sophisticated and experienced investors, possessing a large, dedicated and experienced research staff that was capable of having conducted the same investigation as the analyst.

170.    As indicated above, Lead Plaintiffs sought to deal with this argument, which Lead Plaintiffs believe could well have been persuasive to a jury, by filing a pre-trial motion to

strike Defendants' purported "lack of due care" defense (*see* ¶¶ 105-108, *supra*).   Lead Plaintiffs argued that Section 11 imposes no requirement that investors exercise any care, conduct any investigation, or engage in any due diligence prior to purchasing.  Thus, Lead Plaintiffs argued that the alleged failure to fulfill such purported duty is not a cognizable defense under Section 11.  Had Lead Plaintiffs failed in their attempt to strike this defense, Lead Plaintiffs believe that it would have presented a significant risk.

171.   Finally, under Section 11, Defendants also possessed a potential "due diligence" defense – i.e., that *they* had conducted a "reasonable investigation" or had "reasonable grounds" to believe that the registration statement was free of untruth, error and/or omission. Ordinarily, the "due diligence" defense is established through evidence that the defendant relied in good faith on "advice of counsel".

172.   Accordingly, in another pre-trial motion (*see* ¶ 104, *supra*), plaintiffs moved to bar Defendants from introducing testimony or evidence that they relied upon advice of counsel on the grounds that plaintiffs had been thwarted in their efforts to probe the nature of any such advice by the blanket assertion of attorney-client privilege.  This motion too was unresolved prior to Settlement.  A failure to prevail on the motion would have resulted in significant risks to plaintiffs at trial.

### c.        Specific Damages Risks

173.   As to damages, plaintiffs' risks were high. They were faced with the stark fact that the securities at issue simply did *not* decline in price following the allegedly corrective disclosure.  Ordinarily, such a fact is fatal to a securities class action claim.  As indicated above, Lead Plaintiffs propounded a highly unorthodox damages theory – that the damages were reflected

by the "spread" between the prices of the Bank Debt and the Debt Securities that developed in response to the corrective disclosures.  The prospect of success on this theory raised significant risks.

174.    Under Section 11 of the Securities Act, damages are calculated as the difference between the purchase price of the securities (capped at issuance price) and the greater of either (1) the security price at the time of the inception of litigation or (2) the security price at time of any subsequent sales.[11]  Section 11, however, provides defendants with the affirmative defense known as "negative causation", which allows a defendant to avoid liability for such portion of a security's depreciation that can be shown to have resulted from matters *other* than those complained of.  In other words, defendants can seek to show that some or all of the decline in value of the security in question was not caused by the matters allegedly omitted and/or misrepresented in the registration statements, but by other factors.

175.    Defendants here presented a strong "negative causation" defense. They pointed out that the majority of the declines in the prices of the Debt Securities occurred *prior* to the allegedly corrective disclosures.  Accordingly, Defendants argued that plaintiffs' losses were the result of factors *other than* those at issue in the Litigation (specifically, of fears that Owens Corning's asbestos liabilities would propel the company into bankruptcy and result in insufficient assets to pay the holders of the Debt Securities). These arguments were set forth by Defendants' damages expert, Professor Christopher M. James, who gave them central positioning in his expert report and "event study."  Citing these arguments, Defendants also moved for summary judgment

---

[11]      If the securities were sold prior to the inception of the litigation, damages are the difference between purchase price and such pre-litigation sale price.

(pending at the time of Settlement) seeking dismissal on the grounds that plaintiffs had no damages to assert.

176.    Therefore, the damages scenario facing plaintiffs here diverged dramatically from archetypal securities class action litigation, in which loss causation and the existence and size of damages are more obvious and clear.  Usually, a corrective disclosure is followed by a sharp and immediate price decline, thereby demonstrating loss causation and damages.  Here, the situation was the opposite: the prices of the relevant securities declined *before* the corrective disclosures – and then did not decline, but even rose slightly, following the corrective disclosures.  Defendants stood on firm ground, therefore, in seeking dismissal on these grounds.

177.    In order to secure recovery, plaintiffs would have to have overcome Defendants' damages challenges on summary judgment and trial.  Success at summary judgment, let alone both on summary judgment and at trial, was far from guaranteed.

178.    In short, there was substantial risk that plaintiffs' damages claims could be terminated before ever reaching trial.  Nevertheless, Lead Plaintiffs believed that damages existed and were provable by their damages expert at trial.  Lead Plaintiffs contended that, although the prices of the Debt Securities did not decline following corrective disclosures in early 2001, the *spread* between those prices and the Bank Debt dramatically widened (the Bank Debt rose in price while the Debt Securities stayed at the same depressed levels).  Plaintiffs submitted that this spread – *i.e.*, the differential in the price between the Debt Securities and the Bank Debt – represented the impact on the Debt Securities resulting from matters allegedly omitted and/or misrepresented in the registration statements.  Thus, according to plaintiffs, such spread represented the appropriate measure of damages caused by the matters complained of in this case.

61

179.    Further, plaintiffs contended that use of a spread-analysis rather than an absolute-price analysis made economic sense. This was because the misrepresentations and omissions complained of concerned how the holders of the Debt Securities, as creditors, would rank relative to other creditors of Owens Corning – in terms of right to payment in the event of a liquidation, bankruptcy or similar event.   The Complaint alleged that the offering documents misrepresented that the holders of the Debt Securities would rank *pari passu* with the Bank Debt – equal in right of payment.  In fact, the holders of the Debt Securities were structurally subordinated to Owens Corning's indebtedness to the banks and thus ranked below the Bank Debt. Because the misrepresentations and omissions concerned the "relative" value of the Debt Securities compared to the Bank Debt, Lead Plaintiffs contended that evaluation of the "spread" and not the absolute prices of the Debt Securities was economically appropriate.

180.    Lead Plaintiffs believed that their expert's study of the prices of the Debt Securities and the Bank Debt between 1998 and 2005 confirmed their spread theory and claim for damages.  Damages aggregated, according to Lead Plaintiffs' damages expert, to a maximum of $105 million on a Class-wide basis (*see* ¶¶ 88-90, *supra* for details on calculation logic and methodology).  However, as the Debt Securities enjoyed significant price recoveries years after this Litigation commenced, realistically provable damages were significantly lower to the extent that Class members sold their securities at such favorable prices.

181.    Although Lead Plaintiffs strongly believed in their damages evidence, Lead Plaintiffs acknowledged that the unorthodox nature of their "spread" theory raised greater risks than are present in the typical securities class action.  Plaintiffs' proffered "spread" theory evidence might have been precluded by the Court or rejected by the jury.  Even if accepted by the Court and jury,

the First Circuit could have rejected it on appeal.

182.     Apart from this fundamental challenge on damages, plaintiffs faced further damages-related concerns.  The fact that the prices of the Debt Securities did not decline in response to the corrective disclosures was also seized on by Defendants with respect to other substantive elements of plaintiffs' claims.  For instance, defendants argued that the lack of a decline proved (1) that the allegedly "corrective" disclosures corrected nothing because the market already was aware of the relevant facts, and (2) that the allegedly corrective disclosures were immaterial.

183.     Additionally, as a result of developments in Owens Corning's bankruptcy proceedings, the Debt Securities significantly recovered in price.  At times during the Litigation the Debt Securities traded at prices *higher* than their offering prices. This eliminated or significantly reduced Section 11 damages for any class members who sold some or all of their Debt Securities at such favorable levels.  At trial, plaintiffs therefore expected Defendants to suggest that any losses suffered by Class members were not the result of Defendants' actions, but rather of investors' failure to sell the Debt Securities at a profit when they had the chance to do so.  Lead Plaintiffs believed that such argument could well have persuasive appeal to a jury.

184.     Finally, as is often the case in complex securities litigation, damages matters may well have developed into the famous "battle of the experts".  The outcomes of such battles are notoriously difficult to predict and thus inherently, and deeply, risky.

## 5.     Risk of Maintaining the Class Action Through Trial

185.     As detailed above (¶¶ 38-48, *supra*), by the time of the Settlement, Lead Plaintiffs had already litigated class certification issues, conducted significant class-related discovery, and secured certification of the Class as to Lead Plaintiffs' central claims (omissions,

misrepresentations, and misleading statements in the registration statements for the Debt Securities).[12]  Lead Plaintiffs believe that the class aspects of this Litigation were secure.

### 6.      Ability of the Defendants to Withstand a Greater Judgment

186.      Often in class action litigation, defendants argue that a class' *ad damnum* is so large that it effectively forces defendants to settle.  Those facts were absent here.

187.      Defendants here – which included more than a dozen of Wall Street's largest investment banks and broker/dealers – enjoyed a financial strength that dwarfed plaintiffs' Class-wide damages estimate.[13]  It would appear on its face that Defendants possessed nearly limitless resources both to defend against and later to fund a judgment.  Defendants here faced no prospect of ruinous judgment that could sound the "death knell" to corporate viability; Defendants' financial strength confirms that they could have gone through trial without going-concern risk.

188.      In short, Defendants did not "need" to settle.  That reality reinforces that Lead Plaintiffs earned this Settlement on the merits:  fear of judgment provided no incentive to early settlement.

### 7.      Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks of the Litigation

189.      Generally, the recovery achieved is the most important factor in assessing the fairness, reasonableness and adequacy of a settlement.

190.      The recovery achieved here strongly supports the Settlement's approval.

---

[12]      Lead Plaintiffs failed to secure Class certification for their Section 12 claims of oral misrepresentations in connection with the sale of the Debt Securities.

[13]      For example, Goldman Sachs' net income for 2006 – $9.5 billion – is nearly 100 times plaintiffs' highest aggregate damages estimate ($105 million).

Viewed absolutely, the Settlement provides Class members with a recovery of damages that is truly substantial.  Viewed relatively, the Settlement provides Class members with a recovery of damages demonstrably superior to that provided on average by securities class action litigation.

191.    Here, as indicated above, plaintiffs believed that maximum class-wide damages were no more than $105 million, and realistically provable damages significantly less. Defendants protested vociferously that damages were most likely $0 and in no event more than approximately $1.5 million.  Pending at time of Settlement was Defendants' summary judgment motion making exactly that argument.

192.    Therefore, were one to assume a best-case scenario for plaintiffs, in which plaintiffs continued the Litigation and routed Defendants at every subsequent turn – summary judgment motions, *Daubert* motions, further pre-trial proceedings, trial, post-trial motions, and appeals – and assuming that no members of the Class sold their Debt Securities at the post-commencement recovery prices, plaintiffs might have recovered their maximum possible damages of $105 million.  The $19.25 million recovery achieved in this Settlement represents 18.2% of this figure.

193.    This is not only a significant recovery in and of itself, but is several multiples of the average recovery normally achieved through securities litigation.[14]

---

[14]    *See* Ronald I. Miller, Todd Foster & Elaine Buckberg, *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, Is Stabilization Ahead?* (NERA Economic Consulting, April 2006) at pp. 7-8 (finding a median recovery of 2.5%-3% of investors' losses in recent securities class action settlements); *accord*, Laura E. Simmons and Ellen M. Ryan, *Post-Reform Act Securities Settlements: 2005 Review and Analysis* (Cornerstone Research, 2006) at p. 5 (average settlement recovered 3% of aggregate damages).  *See also*, *In re Rite Aid Corp. Securities Litigation,* 146 F.Supp.2d 706, 715 (E.D. Pa. 2001) ("recent study shows that settlements since 1995 of securities class actions have recovered between 5.5% and 6.2% of the class members' estimated (continued...)

194.    Were one to assume, more realistically, that the Litigation continued and that Lead Plaintiffs and Defendants were equally skilled, equally successful, and equally lucky, then plaintiffs might have recovered an amount at perhaps the midpoint of Lead Plaintiffs' and Defendants' damages estimates: i.e., $53 million.  The recovery through Settlement provides more than 36% of such a blended figure.  Of course, given the substantial risks that plaintiffs faced on damages, even before the entrance of a jury (e.g., Defendants' summary judgment on damages grounds), continued Litigation could have resulted in a much, much lower recovery, or no recovery at all.

195.    In sum, the recovery achieved through this Settlement provides Class members with an outstanding recovery, and one all the more compelling in light of the risks detailed above.

## IV.    THE PLAN OF ALLOCATION

196.    As discussed above and as set forth on page 8 of the Notice mailed to the Class, the Plan of Allocation will distribute the Net Settlement Fund among Class members who submit timely and valid proofs of claim by calculating a Recognized Loss for each such claimant. The calculation of claimants' Recognized Losses is simple and transparent:  the difference between

---

[14](...continued)
losses"); *In re Merrill Lynch & Co. Inc. Research Reports Securities Litigation*, 2007 WL 313474, at * (S.D.N.Y. Feb. 1, 2007) (commending counsel for recovering only 6.25% of estimated damages, a recovery the court deemed to be "at the higher end of the range of reasonableness of recovery in class action securities litigations"); *Kurzweil v. Philip Morris Co., Inc*., 1999 WL 1076105, at *2 (S.D.N.Y. Nov. 30, 1999) (normal range for recovery in securities class action is between 7% and 15% of the total damages); *In re Lease Oil Antitrust Litigation*, 186 F.R.D. 403, 434 n. 47 (S.D. Tex. 1999) (citing various studies showing the average recovery in securities litigation cases to be between 4% and 14% of the total loss); *In re Ashanti Goldfields*, 2005 WL 3050284, at *4 (E.D.N.Y. Nov. 15, 2005).

price paid in purchasing the Debt Securities and the price received in selling or redeeming the Debt Securities. This appropriately results in Recognized Losses that are exactly coextensive with each Class member's actual economic losses and essentially coextensive with each Class member's legally-cognizable damages.

197.    Here, as to liability, the claims of various Class members do not vary in strength according to the dates of their purchase of the Debt Securities (as often happens in class actions spanning multiple years). All Class Members, no matter when they purchased the Debt Securities, were equally misled by the same alleged material misrepresentations and omissions; there were no partial corrective disclosures during the Class Period that could serve to distinguish the quality of Class members' claims; and corrective disclosure occurred only *after* the end of the Class Period. Therefore, no artificial adjustments, formulas or weightings need be introduced to allocate more to some Class members than to others so as to reflect relatively greater or lesser strengths of claims.

198.    As in almost all class actions, it is damages that vary. Variation here is simple and one-dimensional: there are no qualitative or categorical differences among Class members, but rather only the minor factual specifics of each Class member's dates of purchase and sale of the Debt Securities (which largely determine the prices paid and received for the Debt Securities). The Plan of Allocation takes these differences into account, directly and exactly. Class members whose losses are greater – for example, Class members who purchased the Debt Securities at higher prices (in the original offerings of the Debt Securities, for example); or Class Members who sold the Debt Securities at lower prices – will report correspondingly greater Recognized Losses and receive correspondingly greater allocations of the Net Settlement Fund.

199.    The Plan thus equitably allocates losses to Class members in accordance with the structuring facts here – uniform claims as to liability, varying economic losses determined by each Class member's dates of purchase and sale, and statutory damages that parallel economic losses.

## V.    EVALUATION OF THE FEE REQUEST

### A.    Basic Facts

200.    As detailed below and in the accompanying memorandum of law submitted in support of Lead Plaintiffs' counsels' fee application (the "Fee Brief"), plaintiffs' counsel believe the Fee Request here – 25% of the Settlement fund, together with interest thereon, as well as reimbursement of litigation expenses of $274,804.85 – to be fair and reasonable and to merit the Court's approval.

201.    As detailed in the Fee Brief, this Court should, pursuant to prevailing standards under the PSLRA[15], accord a "presumption of reasonableness" to Lead Counsel's Fee Request. This is because the award of fees requested – 25% of the aggregate amount recovered, plus expenses – was negotiated by experienced and sophisticated institutional investors (i.e., Hancock)

---

[15]    *See, e.g., In re Cendant Corp. Litigation*, 264 F.3d 201, 254-256 (3rd Cir. 2001) ("under the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel.  This presumption will ensure that the *lead plaintiff, not the court, functions as the class's primary agent vis-a-vis its lawyers.*  Further, by rendering ex ante fee agreements more reliable, it will assist those agreements in aligning the interests of the class and its lawyers during the pendency of the litigation."); *see* Elliot Weiss & John Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2105 (1995) ("[A] court might well feel confident in assuming that a fee arrangement an institutional investor had negotiated with its lawyers before initiating a class action maximized those lawyers' incentives to represent diligently the class's interests, reflected the deal a fully informed client would negotiate, and thus presumptively was reasonable.").

who were duly appointed here as lead plaintiffs, and thereby statutorily authorized to retain and enter into a fee arrangement with class counsel.

202.    Lead Plaintiffs commenced this action using the law firm of Dwyer & Collora, LLP ("D&C") as Lead Counsel.  D&C litigated this action through the class-certification stage on an ordinary hourly, non-contingency-fee basis.  On September 16, 2004, Lead Plaintiffs formally retained present Lead Counsel, Kirby McInerney & Squire, LLP, to replace D&C as Lead Counsel.  D&C continued to assist the litigation as Liaison Counsel, on an hourly, non-contingency-fee basis.

203.    Hancock's retention of KMS was memorialized in a written retention agreement (the "KMS Retainer Agreement") executed after several weeks of negotiation between Hancock's in-house legal department and KMS.  Pursuant to the KMS Retainer Agreement, KMS litigated this action on a contingency fee basis, while Lead Plaintiffs agreed to support an application by KMS for an award of fees of up to 25% of the aggregate of any amount recovered, plus expenses. KMS, however, is not entitled to keep the entire award.  Under the KMS Retainer Agreement, KMS is obligated to reimburse Hancock for the attorneys' fees and expenses that Hancock has paid out-of-pocket to D&C, plus any unpaid attorneys' fees or expenses incurred by D&C and owed by Hancock, out of any attorneys' fees and expenses awarded to KMS by the Court.

204.    KMS also agreed to pay Hancock interest with respect to Hancock's out-of-pocket payments to D&C.

205.    Hancock's agreement is in itself strong evidence of the reasonableness of the fee requested, but under the circumstances it should be considered even more significant.  While most class action retention agreements are negotiated pre-litigation and at a point when the client

has a mere speculative possibility of being appointed lead plaintiff, by the time the retention agreement was negotiated here, Hancock not only had been appointed lead plaintiff but had also been appointed class representative.  Thus, at the time of the KMS Retainer Agreement, Hancock was found adequate and functioning as a duly appointed fiduciary to the Class.  Furthermore, having already litigated the motions to dismiss and for class certification, Hancock – which is not only a large and sophisticated institutional investor with substantial fiduciary experience but also (as an insurer) essentially in the business of evaluating litigation risk – was fully aware of the risks associated with the Litigation, including the strengths and weaknesses of the claims, the salient defenses being asserted by the Defendants and the likely course of the Owens Corning bankruptcy. Thus, unlike in most cases (in which the lead plaintiff retains lead counsel prior to any substantive litigation), Hancock here, at the time it retained KMS, possessed a thorough understanding of the Litigation.

206.    Also unlike in most cases, Hancock negotiated the KMS retention agreement after having invested a large amount of its own money *out-of-pocket* to finance the successful prosecution of this Litigation. Thus, having committed such funds, Hancock had an especially strong and unique motive to ensure that the Class continued to be well represented by a Lead Counsel engaged on appropriate terms.

207.    Accordingly, the Fee Request here is entitled to a presumption of reasonableness.  Nothing rebuts this presumption, and any independent analysis only confirms the reasonableness of the requested fees here.  Indeed, the Fee Request falls well within the range recognized as fair, reasonable and appropriate in federal securities class actions such as this, and in fact is slightly below the average fee awarded by courts in comparable class action litigation.

70

208.    The Notice mailed to all Class Members informed that plaintiffs' counsel would apply for award of attorneys' fees not to exceed 25% of the Settlement Fund, as well as reimbursement of expenses – incurred and advanced by plaintiffs' counsel in prosecuting this Litigation – not to exceed $400,000.  The Fee Request is in full accord with such Notice; in fact, the actual reimbursement of expenses sought ($274,804.85) is significantly less than the maximum sum adverted to the Class.

209.    No objection has been made by any Class member to any aspect of the Fee Request (or, for that matter, to any aspect of the Settlement and Plan of Allocation).

210.    Lodestar and expenses are summarized below; further detail is provided in the accompanying Affidavit of Mark A. Strauss in Support of Petition for Attorneys' Fees and Reimbursement of Expenses Field on Behalf of Kirby McInerney & Squire, LLP (the "Strauss Affidavit"), and the Affidavit of David A. Bunis in Support of Petition for Attorneys' Fees and Reimbursement of Expenses (the "Bunis Affidavit"), and the exhibits annexed thereto.

211.    Plaintiffs' counsels' cumulative lodestar is total hourly charges (i.e., the "Lodestar") of $2,582,921.75 on 6,383.45 hours of time.  This is a blended rate of $404.63 per hour. The requested fee, amounting to $4,812,500.00 plus interest, represents a multiplier of approximately 1.86 times the Lodestar.

212.    The Lodestar tables in the Strauss Affidavit and the Bunis Affidavit set forth the identity and level of each attorney and paraprofessional who worked on this Litigation, their current billing rates[16] and the number of hours each devoted to this Litigation.  The hourly rates have

---

[16]     For D&C attorneys, the annexed schedules indicate their contemporaneous billing rates.

been approved in judicial settlement hearings and are consistent with rates approved in many securities class action cases.

213.     Exhibit C to the Strauss Affidavit and Exhibit B to the Bunis Affidavit details the $274,804.85 of expenses incurred by Lead Plaintiffs' counsel during the course of prosecuting the Litigation.   The primary driver of expenses was expert fees, which account for $175,577.89, or 64% of total expenses.   Other costs are those necessarily and conventionally incurred during five years of litigation, including: online legal research; telecommunications, delivery and copying costs; travel costs; and fees charged by courts, court reporters and mediators.   These expenses were justified by the level of effort plaintiffs' counsel invested in prosecuting the Litigation and in attempting to bring it to a successful conclusion that maximized ultimate Class recovery.

**B.     Basic Standards**

214.     As detailed in the Fee Brief, courts generally award attorneys' fees in common fund cases by awarding a reasonable *percentage* of the fund as the fee.   *See* Fee Brief, pp. 5-7.  Lodestar is employed as a secondary cross-check to avoid windfalls.  Fee Brief, pp. 8-9.

215.     Given the procedural and substantive safeguards in cases brought under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), recent jurisprudence confers a presumption of reasonableness on fee applications made pursuant to fee agreements negotiated by properly-appointed lead plaintiffs.  Fee Brief, pp. 10-14.  Such presumption is rebutted only upon a *prima facie* showing that the fee application is excessive.  *Ibid*.

216.     The most common method courts have employed to assess the reasonableness of fees is to consider an explicit set of factors (e.g., the result obtained for the Class, the quality of representation, the risks as to liability and damages, fees awarded in similar cases, etc.).   Fee Brief,

72

pp. 15-16. The factors vary from Circuit to Circuit, although a core set of factors is discernible across Circuits. *Id.*, p.16. A few Circuits employ or mandate use of benchmark reasonable fee (most notably, the Ninth Circuit's benchmark of 25%), from which district courts may depart upwards or downwards given case specifics. *Id.*, p. 38. The First Circuit has not mandated any specific method or any set of factors for determining a reasonable fee; however, district courts in the First Circuit have employed certain methods and factors consistent with other Circuits. *Id*, pp. 15-16, 19-40. These are further discussed below.

### C.    The "Core" Factors Used by Courts in Assessing and Awarding Fees

#### 1.    The Result Obtained: The Size of the Fund Created and the Number of Persons Benefitted

217.    As already discussed above in connection with judicial evaluation of the Settlement itself (*see* Section III.C.7, *supra*, ¶¶ 189-195), and as further discussed in the Fee Brief at pp. 19-20, the recovery achieved for the Class here is an excellent one from every point of view.

218.    The $19.25 million Settlement Fund represents approximately 18.2% of maximum possible damages (and a larger but indeterminable percentage of realistically provable damages). This is not, then, a "pennies on the dollar" matter, but rather a substantial recovery in and of itself. Viewed relatively, the Settlement only improves. The recovery achieved here is several multiples the class action norm. *See* ¶¶ 193-194, *supra*, and Fee Brief at pp. 19-20 (citing academic studies and judicial observations of class action recovery norms). Thus, the Settlement is not merely substantial, but demonstrably superior. That such recovery was achieved in the face of extraordinary damages risks – Defendants insisted that damages were $0, and had pending at time of Settlement a strong summary judgment motion to that effect – makes the recovery more remarkable still.

219.    Furthermore, given that this is not a stock investors' class action involving

73

tens of thousands of Class members, but is rather a bond investors' class action involving at most a few hundred Class members, Class members' individual recoveries will be unusually substantial ones here. In contrast to certain class actions, where seemingly large aggregate recoveries are to a large extent a mere byproduct of a large Class, and where each Class member thus receives relatively little, the aggregate recovery here actually translates into substantial individual Class member recoveries.

220.    Given the above, it is not surprising that the Class's reaction to the Settlement has been overwhelmingly – in fact, unanimously – positive. No Class member has objected to any aspect of the Settlement, the Plan of Allocation, or the Fee Request. Furthermore, no Class member has sought to opt-out of the Settlement in order to preserve claims for individual assertion.

## 2.    Class Response:  The Presence or Absence of Substantial Objections

221.    As with the "result obtained" factor, the "class response" factor is highly relevant to evaluation of a settlement as well as of attorneys' fees – and likewise has already been discussed above (*see* Section III.C.2, *supra*, ¶¶ 149-154) as well as in the Fee Brief at pp. 21-22.

222.    To summarize, one of the most concrete indicators as to the adequacy of a proposed Settlement or as to the reasonableness of proposed attorneys' fees is the class's response – as measured by the level of objections and requests for exclusion.

223.    The class response here is very clear. Not a single Class member has objected to the Fee Request (or to any aspect of the Settlement), and not a single Class member has sought to opt-out of this Litigation and its Settlement. Again, the total absence of objections is all the more remarkable here given the makeup of this Class, which is believed to be composed primarily of large, sophisticated institutional investors – i.e., precisely the investors who have the greatest

74

capability and inclination to object when warranted.

### 3.     The Attorneys' Skill, Efficiency and Quality of Representation

224.    The quality of representation is ultimately and most concretely measured by the results obtained – which, as already described above, are here higher than the class action norms, and which here have been greeted by the Class with unanimous, total approval.

225.    My firm, which acted as lead counsel for Lead Plaintiffs and the Class, specializes in complex federal civil litigation, and particularly in litigation of securities and other class actions. A firm resume is attached as Exhibit E to the Strauss Affidavit.

226.    My firm has been responsible for some of the most successful securities class action recoveries to date.[17] Moreover, my firm is one of the very few that has actually taken such litigation through trial and prevailed.[18] Furthermore, my firm has made a minor specialty in

---

[17]     For example, as sole lead counsel in *In re Cendant Corp. PRIDES Litigation*, we recovered in excess of $340 million for the class, which constituted a 100% recovery, and did so in a manner that sought to preserve Cendant's viability rather than destabilize it. *See In re Cendant Corp. PRIDES Litigation*, 51 F.Supp.2d 537, 542 (D. N.J. 2000) ("The Court is more impressed by the quality of result than the quantity of effort. The class will receive its full entitlement. And resolution of this matter was greatly accelerated by the creative dynamism of counsel...We have seen the gifted execution of responsibilities by a lead counsel."), *vacated*, 243 F.3d 722 (3rd Cir. 2001). More recently, in the Adelphia matter, my firm, acting as co-lead counsel for a class of Adelphia stockholders and bondholders, recovered $455 million for the Class even though the traditional and primary sources of recovery – the company itself, and the family that owned most of the company and had engaged in most of the wrongdoing – were unavailable. *See In re Adelphia Communications Corp. Securities and Derivative Litigation*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 13, 2006) ("lead counsel are two law firms well known and experienced in class action litigation. The quality of their work is, of course, best shown in the results they have achieved here: an all cash settlement of just under $455 million. The Court believes that Judge Cote's description of the achievement of counsel in the WorldCom litigation applies here as well: 'If the Lead Plaintiff[s] had been represented by less tenacious and competent counsel, it is by no means clear that [they] would have achieved the success [they] did here on behalf of the Class.'").

[18]     *See, e.g.*, *Gerber v. Computer Associates International, Inc.* 303 F.3d 126 (2d Cir. (continued...)

pursuing particularly meritorious "niche" claims possessed by purchasers of non-common stock securities (e.g., purchasers of bonds and hybrid or convertible securities). Often, the claims possessed by such "niche" classes have unique strengths, which would be diluted if subsumed within broader suits asserted on behalf of more broadly-defined classes (e.g., a class comprised of purchasers of "all securities" of an issuer). By refusing to dilute such niche claims, and instead pursuing them through litigation structured specifically to preserve their full strength, my firm has achieved substantial and superior recoveries, including in cases led by Hancock, the Lead Plaintiffs here.[19]

227. Moreover, our reputation and record as attorneys able and unafraid to carry a meritorious case through trial and appellate levels gave us strong leverage and credibility in settlement negotiations with Defendants, and aided in achieving the recovery produced here.

228. The quality of representation provided by my firm here is further highlighted in numerous ways.

229. First, given the above-average risks to recovery in this Litigation (*see* ¶¶ 158-

---

[18](...continued)

2002) (jury verdict for plaintiff class, $9 million recovery); *Gordon v. Microsoft Corporation*, Civil No. 00-5994 (Minn. Dist. Ct., Henn. Co.) (civil antitrust case in Minnesota state court; settled for $175 million after nearly two months of trial); *Vladimir v. U.S. Banknote Corp.,* No. 94 Civ. 0255 (S.D.N.Y. 1997) (multi-million dollar jury verdict for plaintiff class).

[19]    *See, e.g.*, *In re Laidlaw Bondholder Securities Litigation*, 00 cv 2518-17 (D. S.C. 2002) ($42.8 million bondholder settlement); *Argent Classic Convertible Arbitrage Fund v. Amazon.com*, No. C-01-0640L (W.D. Wash. 2006) ($20 million bondholder class settlement providing recovery far superior to parallel stockholder class action); *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 00 cv 1114 (E.D. Pa. 2005) (represented bondholder who opted out of Rite Aid class actions [which recovered more than $300 million] and secured recovery superior to that provided by the class action)**;** *Muzinich & Co., Inc. et al. v. Raytheon Company et al. ,* No. C-01-0284-S-BLW (D. Idaho 2005) ($39 million settlement).

76

184, *supra*), and especially the severe and immediate damages-related risks (*see* ¶¶ 173-184, *supra*), the recovery achieved through counsels' skill and effort is all the more remarkable. Plaintiffs faced a strong, real and immediate risk of no recovery at all.

230.     Second and third, this recovery was achieved through years of sustained, complex litigation efforts (*see* ¶¶ 25-115, 155-157, *supra*), undertaken by my firm on a contingent basis in circumstances that presented us with much higher than usual risks of nonpayment (*see* ¶¶ 240-250, *infra*).

231.     Fourth, the quality of the work performed by plaintiffs' counsel may also be evaluated in light of the quality of the opposition they faced. Here, plaintiffs were opposed by three sets of respected, prestigious and able counsel – Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"); Dechert LLP; and Ropes & Gray LLP. Fried Frank, representing the Underwriter Defendants, has more than 600 attorneys, provides "one of the leading securities and shareholder litigation practices in the United States", and is ranked among the twenty best law firms in the country by the *American Lawyer*.[20]  Dechert LLP, representing the Individual Defendants, fields more than 1,000 attorneys, is among the fourteen firms identified by *American Lawyer* to possess the most "top-ten" practices, and provides a highly-respected and fast-growing class action defense practice across multiple spheres (including products liability, antitrust and securities). Ropes & Gray employs more than 800 attorneys and has one of the largest and most experienced securities and corporate litigation practices in the country.[21]  These firms are skilled and experienced in

---

[20]     See "Fried Frank Facts" available on Fried Frank's website www.ffhsj.com.

[21]     See overview of Ropes & Gray's securities litigation practice at www.ropesgray.com/securitieslitigation/.

defending actions such as these, senior litigation partners headed teams from each of these firms in vigorously defending against this action, and the caliber of the legal work performed by the defense attorneys was superior. Plaintiffs' counsel were thus confronted with formidable opposition. Nevertheless, plaintiffs' counsel was able to develop plaintiffs' case sufficiently to press Defendants into settlement of this action. The ability of plaintiffs' counsel to achieve the recovery they did here, in the face of such formidable legal opposition, provides substantial evidence of the quality of their work.

232.    Fifth, plaintiffs' counsel in this Litigation were absolutely alone in pursuing the Class's claims, and are alone responsible for the recovery. There was no public scandal or outcry here. There were no criminal indictments, no *de facto* or *de jure mea culpas*. There was no governmental or regulatory investigation, prosecution or findings (which often directly aid or subsidize private class action cases).[22] There was only plaintiffs' counsel, pursuing recovery on behalf of a class of sophisticated financial institutions who silently lost millions of dollars.

### 4.    The Risks, Complexity and Difficulty of the Litigation

233.    Securities class actions are universally acknowledged to be among the most complex types of litigation. As to liability, they often (as here) center on highly technical and abstruse financial issues. As to damages, they feature extremely complicated issues of loss causation and damages measurement, which often (as here) devolve into the famed "battle of the experts" and thus add into the mix the limitless expert arcana of event studies, statistical analysis

---

[22]    *See* Fee Brief at pp. 25-26 and fn. 32 (citing cases); Laura E. Simmons and Ellen M. Ryan, *Post-Reform Act Securities Settlements: 2005 Review and Analysis* (Cornerstone Research, 2006) at p. 12 (finding that 20% of securities class action cases are accompanied by SEC actions, and that in such cases the median settlement is nearly twice the size of settlements in cases unaccompanied by SEC actions).

and manipulation, etc.

234.   Additionally, over and above their complexity, securities class actions are also as a general matter particularly difficult.  The PSLRA has enhanced the difficulty of such litigation for plaintiffs by altering the legal standards governing securities class actions in ways that generally benefit defendants.[23]  Moreover, in most securities class actions, Defendants have the further advantage of possessing witnesses friendly to the facts, while plaintiffs are forced to proceed without any such witnesses.

235.   This Litigation featured all the normal complexities and difficulties that inhere in securities class actions.  It was not notably more complex or difficult than other such actions – which fact, in part, stems from plaintiffs' counsels' disciplined strategy to present plaintiffs' case in its simplest and strongest form.

236.   However, this Litigation presented substantially greater risks, especially related to damages, than the average securities class action.  Those risks have already been discussed at length (*see* ¶¶ 158-184, *supra*).  Most notably, plaintiffs' "spread-analysis" damages theory was highly unconventional and far more risky than usual.  In most securities class litigation, the alleged corrective disclosure is followed by a sharp and immediate price decline in the relevant securities, which makes damages and loss causation relatively clear.  Here, however, corrective disclosure was *not* followed by a Debt Securities price decline, which allowed Defendants not simply to dispute the *amount* of damages claimed, but to dispute the very *existence* of any damages at all.  Indeed,

---

[23]   Ronald I. Miller, Todd  Foster & Elaine Buckberg, *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, Is Stabilization Ahead?* (NERA Economic Consulting, April 2006) at p. 4 (noting that dismissal rates have doubled since enactment of the PSLRA, and that the 26% dismissal rate in the First Circuit was third-highest among all Circuits).

pending at time of settlement was Defendants' strongly-argued and expert-backed summary judgment motion that threatened to dispose of the entire Litigation on grounds that plaintiffs could not show any damages.

237.    In the absence of a Debt Securities price decline, plaintiffs' counsel propounded the "spread" theory – that damages should be measured by the "spread" that developed in reaction to the corrective disclosures between the prices of the Bank Debt and the Debt Securities. Although plaintiffs' counsel believed such damages theory to be meritorious, and factually and economically logical and correct, plaintiffs' counsel nevertheless acknowledge that such damages claims are highly unusual and relatively incongruent with statutory language and case law concerning damages and loss causation.

238.    The risks facing plaintiffs here were, in short, real, immediate, and – with respect to damages – much, much higher than usual.  These risks were not minor ones that would merely chip away at one part or another of plaintiffs' case, but rather existential ones that threatened to dispose of plaintiffs' case quickly and entirely.   Even had plaintiffs' claims survived such challenge at summary judgment, they would face exactly the same challenges all over again at the *Daubert* stage and at trial.  And even were plaintiffs successful at those stages, Defendants – given facts favorable to them here – would be certain to appeal.  In short, there were tremendous obstacles to Class recovery here, and real risks that the Class (and plaintiffs' counsel) would recover nothing

239.    That plaintiffs' counsel managed to achieve the substantial and superior recovery they did here in the face of such risks strongly supports the Fee Request.

### 5.     Contingency and the Risk of Non-Payment

240.    As discussed in the accompanying Fee Brief, determination of a fair and reasonable fee must include consideration not only of the risks facing plaintiffs in the Litigation, but also of the risks specifically facing plaintiffs' counsel, who often prosecute such cases on a contingent basis and face the risk of non-payment.

241.    My firm accepted and pursued this Litigation on a contingent fee basis pursuant to the KMS Retainer Agreement described above. Pursuant to that agreement, Lead Plaintiffs agreed to support an application by KMS for an award of fees of up to 25% of the aggregate of any amount recovered, plus expenses.  KMS, however, is not entitled to keep the entire award.  Under the KMS Retainer Agreement, KMS is obligated to reimburse Hancock for the attorneys' fees and expenses that Hancock has paid out-of-pocket to D&C, plus any unpaid attorneys' fees or expenses incurred by D&C and owed by Hancock, out of any attorneys' fees and expenses awarded to KMS by the Court.

242.    At the time my firm was retained, D&C had already incurred approximately $500,000 in attorneys' fees and expenses for which they had received payment from Hancock. Accordingly, my firm undertook this contingency-fee representation under circumstances where it was already approximately a half-million dollars "in the hole."  My firm faced the very real prospect that any award of attorneys' fees would, after reimbursing Hancock, be insufficient to cover our lodestar, let alone provide us with a multiple of our lodestar sufficient to compensate us for the risk of non-payment.

243.    We thus understood that we were embarking on a complex, risk-laden, expensive and lengthy litigation with no guarantee of ever being reimbursed, let alone compensated,

for the investment of time and money the case would require.  In undertaking that responsibility, we obligated ourselves to ensure that sufficient dollars and attorney resources were dedicated to the prosecution of this Litigation despite the uncertainty of any reimbursement for such effort and resources.

244.  Frequently, plaintiffs' counsel take contingent cases such as this and, after expending thousand of hours and many thousands of dollars, receive nothing.[24]  The risk of non-payment in complex cases such as this one is real, as my firm knows from first-hand experience.[25]

---

[24]  It is a commonplace for plaintiffs' counsel across the nation to have expended thousands of hours in various class actions and stockholder derivative cases and to have received nothing for their diligence and expertise in litigating those cases through motion practice, pretrial discovery and trial.  *See*, *e.g.*, *Kalish v. Franklin Advisers, Inc.*, 742 F.Supp. 1222 (S.D.N.Y. 1990) (judgment for defendants after bench trial), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Robbins v. Kroger Properties*, 116 F.3d 1441 (11th Cir. 1997), *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *Krinsk v. Fund Asset Management, Inc.*, 715 F.Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Landy v. Amsterdam*, 815 F.2d 925 (1st Cir. 1987); *Spielman v. General Host Corp.*, 402 F.Supp. 190 (S.D.N.Y. 1975), aff'd, 538 F.2d 39 (2d Cir. 1976).

[25]  Lead Counsel litigated  –  throughout the 1990s, in California federal district court, the Ninth Circuit Court of Appeals (on three occasions), the United States Supreme Court, Delaware Chancery Court, and the Delaware Supreme Court – class claims arising from the purchase of MCA, Inc. by Matsushita Electric Industrial Co..  There, plaintiffs claimed that Matsushita had violated federal securities laws regulating tender offers by paying two MCA insiders more for their shares than Matsushita paid to public shareholders (the Williams Act's "all holders / best price" provision states that all tender offer participants must receive the best price paid to any of them).  After initial dismissal of their claims in trial court, plaintiffs appealed to the Ninth Circuit, which not only reversed the trial court but strongly suggested that plaintiffs were entitled to summary judgment on liability and approximately $1 billion in damages.  *Epstein v. MCA, Inc.*, 50 F.3d. 644 (9th Cir. 1995) ("*Epstein I*").  Concurrently, defendants settled a parallel Delaware state court action over the MCA acquisition by paying $2 million and gaining a release from not only the state law claims but also from the exclusively federal claims asserted in the MCA Action.  Defendants sought to uphold the preclusive effect of that settlement and release  –  one which multiple courts termed "collusive" – and appealed the Ninth Circuit's *Epstein I* decision to the Supreme Court.  The Supreme Court reversed *Epstein I* and held that the Delaware settlement precluded the MCA Action.  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996).  On remand, the Ninth Circuit then found the Delaware settlement to have been invalid because procured through inadequate representation, and

(continued...)

245.    Such contingency is a general and common feature of class litigation such as this.  However, certain factors operative in this Litigation increased the risk of nonpayment here to levels far above securities class action norms.

246.    First, the traditional and primary source of plaintiffs' recovery (the defendant corporation) was here insolvent and protected by bankruptcy, thereby making recovery here far more uncertain than usual.

247.    Second, as discussed above, plaintiffs' "spread-analysis" damages theory was highly unconventional and far more risky than usual.  Such risks presented very real, immediate and ultimate obstacles to recovery of anything at all, and thus to any compensation for my firm's time, efforts and expenses.

248.    Third, plaintiffs' counsel faced a further, very real and extremely unusual risk from the proceedings in the Owens Corning bankruptcy.  As detailed above (¶¶ 45-46), an attempt was made in the Bankruptcy Proceedings to force "substantive consolidation" of the estates of Owens Corning and its subsidiaries.  Such substantive consolidation, by combining the assets of Owens Corning and its subsidiaries, would effectively *undo* the structural subordination of the Debt Securities to the Bank Debt complained of herein.  In short, substantive consolidation threatened to make this Litigation irrelevant and undo the damages of many if not all class members.  And while

---

[25](...continued)
reinstated the MCA Action.  *Epstein v. MCA, Inc.*, 126 F.3d 1235 (9th Cir. 1997) ("*Epstein II*").  The Ninth Circuit granted rehearing and a differently-constituted panel ultimately withdrew *Epstein II* and superceded it with an opposite opinion reinstating the preclusive effect of the Delaware settlement.  *Epstein v. MCA, Inc.*, 179 F.3d 641 (9th Cir. 1999) ("*Epstein III*").  After plaintiffs' petition for *certiorari* was denied, plaintiffs then turned to Delaware and sought to vacate the 1994 judgment from which preclusion stemmed.  Their attempt was denied by the Delaware Chancery Court, *In re MCA, Inc. Shareholders Litigation*, 774 A.2d 272 (Del. Ch. 2001), whose holding was affirmed on appeal by the Delaware Supreme Court, 785 A.2d 625 (Del. Supr. 2001).

substantive consolidation would serve the interests of Class members who retained their Debt Securities, it would have left plaintiffs' counsel high and dry.    In fact, when substantive consolidation was initially granted in the Bankruptcy Proceedings, Defendants concluded that this Litigation had essentially been extinguished.  However, the initial grant of substantive consolidation was subsequently reversed by the Third Circuit on appeal.  Consequently, the Class continued to seek redress in this Litigation.

249.    Fourth and finally, as discussed above, plaintiffs' counsel were alone in pursuing this matter.  There was no governmental or regulatory investigation, no public outcry, no dramatic public events, no *de facto* or *de jure* admissions of misconduct or misstatement – all of which dramatically mitigate nonpayment risks.

250.    Because the fee to be awarded to KMS in this matter was contingent, the only certainty from the time of KMS's retention was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

**6.        The Amount of Time Devoted to the Case by Plaintiffs' Counsel**

251.    This Declaration details half a decade's worth of plaintiffs' counsels' efforts in this Litigation (¶¶ 25-115). Lead Plaintiffs initiated the Litigation in April 2001 (¶¶ 25-26); amended and strengthened their Complaint later in 2001 (¶¶ 27-29); successfully opposed Defendants' two separate motions to dismiss and sustained all their claims in 2002 (¶¶ 30-35); secured certification of the Class in 2004 over Defendants' opposition and after class certification discovery, which included document productions from and deposition of the Lead Plaintiffs (¶¶ 38-48); engaged in substantial discovery, including the review of thousands of pages of documents, taking and defending depositions, and the exchange of multiple sets of interrogatories, between 2003

84

and 2006 (¶¶ 59-71); retained experts, and engaged in expert discovery during 2005 and 2006 (¶¶ 78-93); filed two motions for partial summary judgment in mid-2006, and opposed the Individual Defendants' two motions for summary judgment (¶¶ 94-100); filed further pre-trial, *Daubert* and *in limine* motions in mid-2006 (¶¶101-110); and began trial preparations, including a pre-trial order, witness and exhibit lists, and proposed jury instructions (¶¶ 111).  Settlement negotiations were lengthy and hard-fought ( ¶¶ 72-75, 112-115, 132-137).

252.    In short, this was not a case that settled quickly, or without much work, or during preliminary stages of litigation.  The time, effort, and resources devoted by plaintiffs' counsel here are thus obviously substantial: as detailed below (¶¶ 271, 274-278, *infra*) and in the Strauss Affidavit, plaintiffs' counsels' combined lodestar is $2,582,921.75, and litigation expenses borne by plaintiffs' counsel total $274,804.85.[26]  These are significant sums – all the more so given the contingent nature of counsels' engagement and the elevated, case-specific risks of nonpayment discussed just above.   Plaintiffs' counsel devoted many years and thousands of hours to this matter at great risk.  Plaintiffs' counsel believe that the skill with which they did so, and the readiness they manifested at all times to advance the Class's interests through to trial, contributed significantly to the superior recovery ultimately obtained through this Settlement.

**7.    Fee Awards in Similar Cases**

253.    Extensive judicial, expert and academic studies unanimously and consistently confirm that the Fee Request here is a reasonable one.

254.    A 1996 study of fee awards in securities class action cases, conducted by

---

[26]    The Strauss Affidavit includes breakdowns of the hours contributed by KMS and D&C.

National Economic Research Associates ("NERA"), found that fee awards averaged approximately

30%.[27]   The 30% average was consistent across jurisdictions (see Table 1 below) and settlement

sizes (see Table 2 below).

**Table 1**
**Plaintiffs' Attorneys' Fees by Federal Circuit (NERA 1996 data)**

| Circuit | Number of Settlements | Settlements as Percentage of Total | Total Value of Settlements | Total Fees Awarded | Average Attorney Fees as a Percentage of Settlement |
|---|---|---|---|---|---|
| D.C. | 2 | 0.46 | $6.75 million | $2.2 million | 31.67% |
| First | 26 | 6.00 | $82.63 million | $25.68 million | 30.99% |
| Second | 69 | 15.94 | $440.28 million | $139.04 million | 31.48% |
| Third | 58 | 13.39 | $423.29 million | $132.74 million | 32.00% |
| Fourth | 12 | 2.77 | $75.32 million | $23.72 million | 32.78% |
| Fifth | 26 | 6.00 | $262.72 million | $81.42 million | 30.73% |
| Sixth | 13 | 3.00 | $120.88 million | $36.92 million | 31.00% |
| Seventh | 18 | 4.16 | $149.93 million | $48.38 million | 31.83% |
| Eighth | 12 | 2.77 | $52.18 million | $17.64 million | 32.47% |
| Ninth | 155 | 35.80 | $1.379 billion | $450.72 million | 32.57% |

---

[27]     *See* Denise M. Martin, Vinita M. Juneja, Todd S. Foster, Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* (NERA 1996).

86

| | | | | | |
|---|---|---|---|---|---|
| Tenth | 13 | 3.00 | $203.65 million | $62.04 million | 32.13% |
| Eleventh | 29 | 6.70 | $168.35 million | $50.00 million | 29.92% |
| Total | 433 | 100.00% | $3.366 billion | $1.070 billion | 31.84% |

**Table 2**
**Plaintiffs' Attorneys' Fees by Settlement Size (NERA 1996 data)**

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Attorneys Fees | Average Fee Award | Mean Fee Award |
|---|---|---|---|---|---|
| less than $1 million | 37 | $24.70 million | $7.62 million | 30.38% | 30.00% |
| $1-$2 million | 66 | $96.51 million | $30.64 million | 31.88% | 33.33% |
| $2-$9.99 million | 245 | $1.184 billion | $381.15 million | 32.11% | 33.33% |
| $10-$49.99 million | 76 | $1.489 billion | $471.16 million | 31.72% | 33.15% |
| $50 million and up | 9 | $571.65 million | $179.92 million | 31.48% | 30.00% |
| Total | 433 | $3.366 billion | $1.070 billion | 31.84% | 33.33% |

255.    A 1999 update[28] to the 1996 NERA study showed that attorneys' fees in securities class actions had continued to average approximately 30% of recoveries:

**Table 3**
**Plaintiffs' Attorneys' Fees (NERA 1999 data)**

---

[28]    See Todd S. Foster, Denise M. Martin, Vinita M. Juneja, Frederick C. Dunbar, *Trends in Securities Litigation and the Impact of the PSLRA* (NERA 1999).

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | June 1999 | 1990s |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Settlements | 48 | 79 | 90 | 101 | 104 | 104 | 98 | 80 | 29 | 733 |
| Total Settlement Value (millions) | $305 | $778 | $749 | $616 | $1,109 | $723 | $770 | $876 | $174 | $6,100 |
| Average Fee Award (Percentages) | 33% | 27% | 24% | 34% | 33% | 31% | 32% | 31% | 33% | 30% |

256.   NERA's data and conclusions were confirmed by the Federal Judicial Center's own study of fee awards, published in 1996.[29]  The Federal Judicial Center study, which examined *all* class settlements (i.e., not just securities class actions) in 4 federal district courts between mid-1992 and mid-1994, found that fee awards (on both mean and median terms) averaged between 26% and 31%:

**Table 4**
**Mean and Median Fee Awards in Class Actions**
**(Federal Judicial Center 1996 data)**

| | Mean Fee Award | Median Fee Award |
|---|---|---|
| Eastern District of Pennsylvania | 28% | 27% |
| Southern District of Florida | 26% | 27% |
| Northern District of Illinois | 31% | 30% |
| Northern District of California | 29% | 30% |

---

[29]     *See* Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* (1996).

257.     The findings of the two NERA studies and of the Federal Judicial Center study were replicated by a further study performed by the Law and Economics Consulting Center which analyzed 1,280 securities class action settlements between 1988 and 1996.[30] During the first half of that period, fee awards averaged 29% of settlement recovery; during the second half, 32% of the recovery.

258.     More recently, and constituting the last word in these matters, Professors Theodore Eisenberg and Geoffrey P. Miller re-analyzed the data from the above-mentioned studies together with data from a more recent and very large study published by Class Action Reports, which itself analyzed 1,120 class action fee awards with a heavy sampling of securities class actions.[31]  *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27 (2004) (the "Miller Study").

259.     The Miller Study stands still as the most comprehensive and sophisticated analysis of class action fee awards.  The Miller Study found that in cases recovering between $15 million and $22 million through settlement (i.e., the cases most comparable to the instant Litigation), the average fee award was 26.7% (and the median fee award was 28%).

260.     Such academic and statistical analyses give objective confirmation of judicial observations concerning fee awards in class action cases.  Throughout federal practice, judges

---

[30]     *See* Vincent E. O'Brien, *A Study of Securities Class Action Fraud Cases*, 1988-1996 (Law & Economics Consulting Center).

[31]     *See* Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 169 (2003).

uniformly agree that class action fee awards generally run between 20% and 33% of Class recovery (*see* Fee Brief at pp. 36-37, citing cases).  Courts in this District have routinely awarded such fees. Fee Brief at p. 37 (citing cases).

261.    In short, the Fee Request here in unquestionably within the range of collective reason, and in fact (as demonstrated by the Miller Study) is slightly below the mean and median fee awarded in cases of comparable magnitude.

### D.    Further Factors Considered by Some Courts in Awarding Attorneys' Fees

262.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations.  The principle was reiterated only months ago by the Supreme Court, which began its opinion in *Tellabs* by stating: "This Court has long recognized that meritorious private actions to enforce federal anti-fraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission". *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. __, 127 S.Ct. 2499, 2504 (June 21, 2007).

263.    The SEC, a vital but understaffed government agency, does not have the budget or staffing to ensure complete enforcement of the securities laws. If this important public policy is to be carried out, the courts should award fees which will adequately compensate plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of the situation.

264.    Public policy considerations were recently well-stated by the Honorable Denise Cote in her opinion in *In re WorldCom, Inc. Securities Litigation*, 388 F.Supp.2d 319, 359 (S.D.N.Y. 2005) (emphasis added), where she held:

Public policy also supports the approval of this fee request. The size of the recovery achieved for the class - which has been praised even by several objectors - could not have been achieved without the unwavering commitment of Lead Counsel to this litigation. Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment. *If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class. In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives. After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation. While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain.*

265.    The same applies here, perhaps even all the more so given that this Litigation, unlike *WorldCom*, was not an obvious one.  Here, there was no restatement of previously-issued financial results (let alone restatement involving billions of dollars), no governmental or regulatory investigation of defendants, no criminal proceedings resulting in jail sentences for executives.  There was only plaintiffs' counsels' efforts to pursue this non-obvious litigation over a few statements made (and not made) in a registration statement and prospectus for a securities offering.

266.    In such offerings, issuers have a singular burden to inform the public adequately – through the registration statement and prospectus – of all material information concerning the new securities to be issued and sold..  Those documents are the required ticket for access to American capital markets.

267.    Therefore, regulatory standards for such offering documents have been intentionally constructed by legislators to reflect the singular responsibility issuers bear in informing the public:

There is a strong affirmative duty of disclosure in the context of a public offering. *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)

The obligations that attend the preparation of a [prospectus] embody nothing if not an affirmative duty to disclose a broad range of material information... [T]he disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic disclosures called for in the company's annual Form 10-K or quarterly Form 10-Q filings under the Exchange Act. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1208 (1ˢᵗ Cir. 1996)

268.    Those disclosure standards are accompanied by strict liability standards intended to prevent the sorts of temptation that can arise when faced with the opportunity to tap public wealth.

269.    Section 11 of the Securities Act imposes liability upon issuers for material misstatements or omissions made in stock offering documents.  As the Supreme Court stated, Section 11 "was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  The principle of Section 11 is immediately clear:  "a corporate issuer, in possession of material undisclosed information, may not issue or otherwise trade in its own stock unless it first discloses this information to the market". *Simon v. American Power Conversion Corp.*, 945 F.Supp. 416, 425 (D. R.I. 1996), *citing Shaw v. Digital*, 82 F.3d at 1203-04 ("a corporation trading in its own securities [is] an 'insider' for purposes of the 'disclose or abstain' rule").

270.    Here, in the bond offerings of the Debt Securities, plaintiffs – and only plaintiffs – have attempted to uphold this regulatory framework..

### E.      The Lodestar Cross-Check

271.      As stated above (¶¶ 211-213) and detailed  in Strauss Affidavit and Bunis Affidavit, plaintiffs counsels' cumulative lodestar is total hourly charges (i.e., the "Lodestar") of $2,582,921.75 on 6,383.45 hours of time.[32]  The requested fee, amounting to $4,812,500.00 plus interest, represents a multiplier of approximately 1.86 times the Lodestar.

272.      The 1.86 multiplier here is well below historical norms for class actions as a whole (3.89 multiplier) and for class actions of similar magnitude (1.97 multiplier), as demonstrated in a recent (2003) study published by Class Action Reports:[33]

**Table 7**
**Lodestar Multipliers by Recovery Range**
**(Class Action Reports 2003 data)**

| Recovery Range | Number of Cases | Multiplier |
| --- | --- | --- |
| more than $100 million | 64 | 4.50 |
| $75 million to $100 million | 26 | 3.93 |
| $50 million to $75 million | 37 | 2.75 |
| $30 million to $50 million | 67 | 2.32 |
| $20 million to $30 million | 65 | 1.90 |
| $10 million to $20 million | 153 | 1.97 |
| $5 million to $10 million | 217 | 1.89 |
| $3 million to $5 million | 142 | 1.89 |
| $2 million to $3 million | 98 | 1.63 |
| $1 million to $2 million | 123 | 1.25 |

---

[32]      The annexed schedules include breakdowns of the hours contributed by each KMS and D&C.

[33]      *See* Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 169 (2003).

93

| | | |
|---|---|---|
| less than $1 million | 128 | 1.10 |
| All Recoveries | 1,120 | 3.89 |

273.     Here, the effective multiplier of 1.86 times Lodestar represented by an award of 25% of the common fund is justified by both by the extraordinary recovery achieved here, the higher than usual litigation and nonpayment risks faced here, and by practice and precedent, where district courts normally award lodestar multiples of between 2 and 5.  *See* Fee Brief at pp. 39-40 (citing cases).

### F.     Expenses

274.     Reimbursement of expenses to counsel who create a common fund is appropriate.  Plaintiffs' counsel have incurred unreimbursed expenses in the amount of $274,804.85 for which they seek reimbursement.  A breakdown of the aggregate expenses incurred, by category of expense, is attached to the accompanying Strauss Affidavit and Bunis Affidavit.

275.     The expenses for which counsel seek reimbursement here were essential to the successful prosecution and resolution of this action, are the types of expenses routinely charged to hourly-paying clients, and therefore should be reimbursed out of the common fund.

276.     The largest drivers of expenses here were expert fees of $175,577.89, which alone account for 64% of total expenses.  The expert fees were essential to prosecute the Litigation through trial because the Litigation presented complex issues of damages, causation and materiality, and because most and perhaps all of the likely witnesses would have been hostile to plaintiffs' case. Given the highly contentious and diametrically opposed positions of the parties with respect to damages, expert testimony was essential in order to establish that the Class suffered any losses at all for which defendants could be liable.  Other costs are those necessarily and conventionally

94

incurred during five years of intense litigation:  online legal research; telecommunications, delivery and copying costs; travel costs; and fees charged by courts, court reporters and mediators.

277.    The litigation expenses incurred here were well within the norm for a large and complex securities litigation.  *See* Fee Brief at pp. 40-42 (citing cases).

278.    The Notice mailed to Class members informed that plaintiffs' counsel would seek reimbursement of up to $400,000 of expenses.  No objection was raised to such amount, which significantly exceeds that actual amount of expenses for which reimbursement is sought here.

## CONCLUSION

279.    Based on all the factors discussed above, as well as the extensive experience plaintiffs' counsel has in the litigation of securities class actions, we believe that the proposed Settlement, which compensates Class members immediately, is far more beneficial than waiting years for a highly uncertain outcome.  It is, therefore, respectfully submitted that the proposed Settlement is fair, reasonable and adequate and should be approved, along with the Plan of Allocation, and that the application for fees and for reimbursement of expenses should be granted.

            /s/ Mark A. Strauss
            MARK A. STRAUSS

95

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and correct copy of this

document filed through the ECF system will be sent electronically to the registered participants

as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those

indicated as non-registered participants on July 30, 2007.


_____   /s/ Daniel J. Cloherty_____